STATE OF VERMONT

| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 113-8-14 Vtec |
|---|---|
| Hinesburg Hannaford Act 250 Permit | DECISION ON THE MERITS |

This Act 250 permit amendment application relates to the proposal of Martin's Foods of South Burlington (Applicant) to construct a 36,000-square-foot Hannaford grocery store and 128-space parking lot (the Project) on Lot 15 of the Commerce Park subdivision in Hinesburg, Vermont. Appellants are a group of Hinesburg residents that oppose the Project. Appellants appeal a District #4 Environmental Commission (District Commission) decision that made positive findings on all Act 250 criteria but for Criterion 2, and thus denied the Act 250 permit application on Criterion 2 grounds alone.[1] The Agency of Natural Resources (ANR), the Natural Resources Board (NRB), and the Town of Hinesburg (Town) are also parties in the matter.

In anticipation of trial, pre-filed testimony was submitted by all parties except the Town. The Town did, however, offer testimony and evidence during trial. The Court conducted a site visit on the morning of November 30, 2015. A merits hearing at the Environmental Division in Burlington followed the site visit and continued through December 2, 2015. At trial, Applicant was represented by Christopher D. Roy, Esq.; Appellants were represented by James A. Dumont, Esq.; the Town was represented by Ernest M. Allen, III, Esq.; ANR was represented by Leslie Welts, Esq. and Jennifer S. Duggan, Esq.; and the NRB was represented by Peter J. Gill, Esq.

Based upon the evidence presented at trial, which was put into context by the site visit, the Court renders the following findings of fact and conclusions of law.[2]

---

[1] There are six additional pending appeals before the Court which are challenges to municipal and state permitting decisions relating to the Project. Pursuant to V.R.E.C.P. 2(b), we consider all seven matters in a coordinated manner; when appropriate we issue separate or joint written decisions. This decision addresses Act 250.

[2] We provide headings and categories within our findings of fact to aid the reader. These should not be read to limit the applicability of the facts to a single issue. Some facts are included to provide context for the entire Project and may go beyond the scope of the specific Act 250 issues raised in this appeal.

1

## FINDINGS OF FACT

1. Martin's Foods of South Burlington, LLC proposes to construct a 36,000-square-foot Hannaford grocery store and pharmacy with an associated 128-space parking lot on Lot 15 of the Commerce Park subdivision in the Town of Hinesburg, Vermont (the Project).

### I. Lot 15 (Hannaford) Site Plan

2. Applicant initially applied for site plan and conditional use approval on November 11, 2010, and the proposal was deemed complete on November 18, 2010. The Hinesburg Development Review Board (DRB) reviewed the application a total of thirteen times from January 2011 through July 2012. The public hearing closed on July 17, 2012.

3. On August 29, 2012 the DRB provided notice to the public and Applicant that the hearing would be reopened. The hearing was reopened on September 8 and continued to October 2. The public hearing finally closed on October 2, 2012.

4. The DRB approved the application with conditions by written decision dated November 6, 2012.

5. Appellants timely appealed that approval to this Court, and Applicant cross-appealed. That appeal was given Docket Number 163-11-12 Vtec (Hannaford Site Plan Appeal).

6. The parties agree that the Hannaford site plan application is subject to the Town of Hinesburg Zoning Regulations adopted on October 12, 2009 (2009 Regulations), the Town Plan adopted on June 13, 2005 (2005 Town plan), and the 2009 Official Map.

7. Lot 15 is one of 15 lots in the Commerce Park subdivision. The subdivision is north of the Hinesburg Village center and is generally located in the triangle formed by Route 116, Patrick Brook, which parallels Commerce Street to its north, and Mechanicsville Road.

8. Route 116 is the main thoroughfare through Hinesburg and runs in a north-south direction.

9. Mechanicsville Road intersects with Route 116 south of the subdivision and extends northeast eventually intersecting with CVU Road to the northeast of the subdivision.

10. Commerce Street is a short east-west connector between Route 116 and Mechanicsville Road that runs just north of Lot 15. Commerce Street forms the hypotenuse of the triangle created by the three streets.

11. Lot 15 is located in the Commercial Zoning District within the Hinesburg Village Growth Area.

2

12. The Project is a permitted use in the Commercial Zoning District, subject to site plan review and approval under the 2009 Regulations.

13. On Lot 15, Applicant proposes to construct a 36,000 square foot Hannaford grocery store with an associated 128 space parking lot. A small portion of land from the adjacent Automotion lot will be acquired to accommodate a public farmers market. Applicant will bring in fill to raise Lot 15 and the area of the farmers market by several feet, requiring regrading and several retaining walls. As part of the Project, Applicant will install a stormwater system to contain runoff from the lot and to treat any pollutants in the stormwater. Applicant will provide significant landscaping and plantings to screen views of the building and parking lot.

14. Access to the Project will share the existing curb cut and access drive for the National Bank of Middlebury on the south side of Commerce Street.

15. The exterior building design is unique in that it was designed specifically for this location and is not a standard design used by Hannaford.

16. The proposed 36,000-square-foot building is a single story with a flat roof. In order to give the appearance of two stories, a wrap-around canopy extends from the side of the building about 9 feet off the ground, and windows are located above the canopy to provide the appearance of a second story and allow natural light into the shopping area.

17. The flat roof of the building is wrapped with a hipped roof in order to create the appearance of a pitched roof and to conceal the HVAC units, while maintaining flat roof space for solar panels.

18. The height of the building is 27 feet (the maximum permitted height is 35 feet).

19. The building materials are predominantly masonry and clapboard and the building colors will be red, brown, and dark green.

20. A covered walkway extends along three sides of the building and will connect with the town sidewalk system.

21. The building is rectangular. The longer façade of the building is 255 feet. The shorter, is 188 feet.

22. Project parking is located to the north and east of the proposed building and will include 128 parking spaces.

23. The proposed store is an infill project. All lots immediately adjacent to Lot 15 and within the Commerce Park subdivision are already developed. The majority of these lots are the site of commercial businesses with no consistent architectural theme or style.

24. To the west of Lot 15, with its entrance along Route 116, is the Automotion auto repair facility operating out of a metal Quonset hut.

25. The Automotion lot is located outside of the Commerce Park subdivision. The boundary of the Automotion lot and Lot 15 forms the western boundary of the Commerce Park subdivision.

26. Adjoining the Automotion lot to the south is the Giroux Auto Salvage lot (Giroux lot). To the west of the Giroux lot, still on the east side of Route 116, is a commercial auto sales operation.

27. Bordering Lot 15 on its northwestern corner is the two-story flat-roofed Dark Star Lighting building.

28. To the east of Commerce Street Extension and just south of Commerce Street, is the National Bank of Middlebury. To the east of the bank are a community health facility and the post office.

29. Crossing to the north side of Commerce Street, from west to east are: a Mobil gas station; Tailhook towing, operating out of a red, multiple-bay garage; several green-roofed long rectangular buildings that are part of a self-storage business; a one-story, off-white building housing Minuteman Press; the red pitched-roof animal hospital; and the flat-roofed brown and gray Nestech building.

30. Northwest of Lot 15, just southeast of the Route 116/Commerce Street intersection, is the Aubuchon lot (Firehouse Plaza) where a small strip-mall type shopping plaza contains an Aubuchon Hardware and several other commercial businesses.

31. A canal runs along the southern border of Lot 15 along the northern side of Mechanicsville Road.

32. In the mid-1990s, Hinesburg received over $100,000 from federal and state authorities for the Hinesburg Streetscape Project to improve sidewalk infrastructure and to construct a paved walkway along the canal (the canal path) as well as to install a footbridge (the Pony Truss Bridge).

33. The canal path runs along the northern side of the canal.

4

34.	In the southwestern corner of Lot 15, the canal path crosses the Pony Truss Bridge and joins Mechanicsville Road on the south side of the canal. A small "pocket park" is proposed for the area immediately north of the footbridge.

35.	At its closest point, the edge of the building will be about 65 feet from the canal, and the overhang of the roof will measure about 42 feet from the edge of the canal.

36.	Landscaping is provided around and within the Project site for aesthetics, shading, and screening.

37.	Applicant will spend over $109,705 on landscaping for the Project.

38.	The landscaping is particularly focused on breaking up the views of the parking lots, screening views of the building and eastern parking lot from Mechanicsville Road, and screening views of the site from Vermont Route 116.

39.	There are six landscaped islands in the two parking areas, which include a mix of trees and shrubs.

40.	Landscaping for the Project includes (feet at maturity):

    a.	40 red maple trees (40-60)

    b.	17 serviceberry trees (15-25)

    c.	7 sugar maple trees (40-50)

    d.	4 Sargent crabapple trees (15-20)

    e.	18 greenspire linden trees (60-70)

    f.	52 white spruce trees (40-60)

    g.	11 Princeton American elm trees (50-60)

    h.	44 redosier dogwood shrubs

    i.	385 rugosa rose shrubs

    j.	55 Anthony Waterer spirea shrubs

    k.	24 Japanese spirea

    l.	20 dark American arborvitae

    m.	1,135 daylilies

41.	A majority of the landscaping is located along the property boundaries and on the outside perimeter of the parking areas.

42.	Landscaping west of the building is located in an easement area on the east side of the Giroux Auto Salvage lot benefiting Lot 15.

5

43.     Substantial landscape plantings are proposed to the south of the building between the canal and the building.  Over $28,000 of the landscaping budget is allocated for the canal path and pocket park.

44.     The current grade of the site is between 337 feet above sea level and 346 feet above sea level.  Through application of fill material Applicant will bring the grade up to 342–344 feet above sea level with the finish floor of the store at 345 feet above sea level.  This is about the same elevation as the post office and National Bank of Middlebury.

45.     Mechanicsville Road is at an elevation of 350 feet.

46.     To accommodate space for a farmers market on Lot 15, Applicant proposes to transfer 0.32 acres from the Automotion lot to Lot 15, and to take an additional 0.13 acres from the Automotion lot and transfer it to the adjacent Giroux lot.  It is necessary for Applicant to receive site plan and subdivision approvals for the acquisition.

47.     The Automotion lot is within the Village Zoning District.  Farmers markets are a permitted use in the Village Zoning District.

48.     Applicant will raise the .32-acre portion by several feet to create a flat grassy area.

49.     During the winter months when the farmers market is not in use, the area is proposed for snow storage.  Snow melt from this area will drain into Applicant's stormwater system.

50.     Because of the raised grade of the Project site, Applicant will install several retaining walls. One will be located along the northwestern boundary with the Dark Star lot, and a second along the western boundary with the Giroux lot just south of the farmers market area.  Two other shorter walls will be placed on either side of the Commerce Street Extension as it opens into the Hannaford parking area.

51.     The retaining walls will be constructed with concrete blocks and will be three to five feet in height.  The two longer walls will be about 100 feet long.

52.     As a condition of the Hannaford site plan approval, Applicant must obtain site plan amendments for two existing developments, the Automotion and Aubuchon lots, as well as amendments to the Commerce Park and Giroux Building Supply subdivision permits.

## II.     Subdivision Revision (Boundary Line Adjustment)

53.     The Automotion lot currently has an area of 1.76 acres.  The proposal is to reduce the lot size to 1.31 acres with 0.32 acres going to Lot 15 and 0.13 acres going to the adjacent Giroux lot.

6

54.     Lot 15 is presently 4.56 acres and the proposal is to increase its size to 4.88 acres.

55.     The Giroux lot is currently 2.35 acres and the proposal will increase its size to 2.48 acres.

56.     The transfer of 0.32 acres from the Automotion lot to Lot 15 requires revision to the subdivision boundaries of two previously approved subdivisions—the Commerce Park subdivision and the Giroux Building Supply subdivision.

57.     The Automotion and Giroux lots are within the Giroux Building Supply subdivision.

58.     The Commerce Park subdivision approval was granted on December 27, 1987.

59.     The Giroux Building Supply subdivision approval was granted on July 27, 1987.

60.     The subdivision revision application was submitted by Applicant on October 15, 2013 and it was deemed complete on November 7, 2013.

61.     The applicable Zoning Regulations are dated November 5, 2013 (2013 Regulations) and the applicable Subdivision Regulations are dated October 12, 2009 (2009 Subdivision Regulations).

62.     On May 6, 2014, the DRB denied Applicant's subdivision revision application. Applicant appealed that denial to this Court and Appellants cross-appealed.  That appeal was given Docket Number 68-5-14 Vtec (Hannaford Subdivision Appeal).

### III.     Automotion Site Plan

63.     The Automotion site is owned by the Bernard A. Giroux Trust, June T. Giroux Trust, Victor J. Giroux Trust, and Ramona M. Giroux Trust (collectively, Giroux Family Trust).

64.     The site plan for the Automotion site was originally approved by the DRB on December 9, 2005.

65.     Applicant filed a site plan amendment application for the Automotion site on October 14, 2013, and it was deemed complete in November of 2013.

66.     On May 6, 2014, the DRB denied the application to revise the Automotion site plan and Applicant timely appealed that denial to this Court.  That appeal was given Docket Number 70-5-14 Vtec (Automotion Appeal).

67.     The parties agree that the Town of Hinesburg Zoning Regulations amended on November 5, 2013 (2013 Regulations) govern the Automotion Appeal.

68.     The site is currently used as an auto repair facility. The site contains a Quonset hut and gravel parking area for 31 vehicles.

69.     The Giroux lot to the south is also owned by the Giroux Family Trust.

7

70.     Due to the reduction in lot size as a result of the 0.32-acre transfer, the Automotion lot will lose about 12 parking spaces and will require changes to the parking, landscaping, and stormwater drainage for the lot.

71.     The 2013 Regulations require a minimum of 10 parking spaces for the existing and unaltered building.  The site plan application proposes a total of 60 spaces, with 28 spaces in the front yard.

72.     Proposed parking is located east (18 spaces), north (14 spaces), and west (28 spaces) of the existing Quonset hut building.

73.     Curb cut access to Route 116 remains unchanged.

74.     The parking lot surface will be a combination of gravel and pavement, all of which is considered impervious for lot coverage.

75.     Existing landscaping includes four crabapple and four cherry trees located along Route 116 and a white cedar hedge located along the eastern lot boundary with Lot 15 (in the area that will be transferred to Lot 15 for the farmers market).  This existing landscaping will be retained with the hedge relocated to the northwest corner of the lot.

76.     Proposed additional landscaping will be generally located on the west, north, and south sides of the proposed parking areas and include twenty-two mugo pines (mature heights of 3 feet), thirty daylilies (mature heights of 2 feet), twenty-one redosier dogwood trees (mature heights of 6 feet), fifteen Japanese spireas (mature heights of 3 feet), and six red maples (mature heights of 50 feet).

77.     Currently, much of the stormwater runoff drains east into a channel between Lots 10 and 11.

78.     As part of the site plan revision, Applicant proposes to redirect the stormwater so that most is captured by the Lot 15 stormwater system.  Some will be redirected westerly to sheet flow across a grass area.

**IV.     Aubuchon (Firehouse Plaza) Site Plan**

79.     The Aubuchon site, also known as the Firehouse Plaza, is located on Lots 9 and 10 of the Commerce Park subdivision, in the northwest corner of the subdivision immediately southeast of the Commerce Street/Vermont Route 116 intersection.

80.      Aubuchon Realty Company, Inc. is the landowner of the property.

8

81. The previous site plan for the Aubuchon lot was approved by the DRB on February 21, 2001.

82. Applicant filed a site plan amendment application on October 15, 2013, and it was deemed complete on November 7, 2013.

83. The Aubuchon site plan amendment application is subject to the 2013 Regulations.

84. On May 6, 2014, the DRB denied the Aubuchon site plan amendment application, and Applicant timely appealed that denial to this Court. That appeal was been given Docket Number 69-5-14 Vtec (Aubuchon Appeal).

85. The lot currently contains an Aubuchon Hardware store, several other commercial businesses in a shopping plaza, and a 52-space parking lot.

86. Access to the plaza is presently provided by a 30 foot-wide curb cut off of the south side of Commerce Street at the northwest corner of the lot near the intersection with Route 116.

87. The Aubuchon site plan application proposes changes to the parking layout, the site's internal traffic circulation, landscaping, and stormwater drainage for the property. Additionally, Applicant proposes to relocate the curb cut access further east on Commerce Street, away from the Route 116 intersection.

88. The existing approved site plan has 52 parking spaces.

89. The proposed site plan increases the number of parking spaces to 59 with some modification to space layout.

90. There are two landscaped islands in the central portion of the parking area.

91. The increase in the number of parking spaces is realized through reconfiguration. No additional paving is proposed.

92. Existing landscaping includes fourteen street trees (two proposed for relocation), and twenty-seven deciduous and evergreen shrubs. All existing landscaping is proposed to remain (some trees will be relocated).

93. Currently, there are six trees (crabapple and/or cherry) on the northern edge of the property along Commerce Street. Two of these trees are proposed to be relocated from the area that will serve as the new access curb cut to the area of the existing curb cut that will be closed. The current health of the trees that are proposed for relocation is marginal.

9

94.     Additional proposed landscaping includes six mugo pines (mature heights of 3 feet), twelve bumald spireas (mature heights of 3 feet), twenty-three spreading yews (mature heights of 3 feet), and nineteen fragrant sumacs (mature heights of 5 feet).

95.     The vegetation will not fully block views of vehicles in the parking areas.  As vegetation matures, more screening will be realized.

96.     Surface water and stormwater accumulate at times along the northeastern corner of the lot along Commerce Street in the area where the relocated curb cut is proposed.  No culverts or other stormwater controls are proposed.

**V.      Conditional Use Review**

97.     Once operational, the Hannaford store will be open to the public between 6:00 a.m. and 10:00 p.m.

98.     Section 4.3.6 of the 2009 Regulations requires conditional use approval for any commercial operation outside the hours of 6:00 a.m. to 10:00 p.m.

99.     There may be up to ten customer service employees who depart shortly after the store closes at 10:00 p.m.

100.    A night shift of up to ten employees will work between the hours of 10:00 p.m. and 6:00 a.m. performing various cleaning duties and restocking shelves.

101.    Up to ten customer service employees will arrive shortly before the store opens at 6:00 a.m.

102.    No deliveries are proposed between 10:00 p.m. and 6:00 a.m.

103.    Applicant obtained a conditional use permit for these activities from the DRB on August 30, 2012.  That conditional use permit was also appealed to this Court by Appellants and given Docket Number 129-9-12 Vtec (Hannaford Conditional Use Appeal).

**VI.     Act 250 Review**

104.    Applicant filed for an Act 250 permit with the District #4 Environmental Commission (District Commission) on March 26, 2013.  In a July 23, 2014 decision, the District Commission denied the Act 250 permit finding the Project did not comply with Act 250 Criterion 2.

105.    The District Commission found the application complied with all other criteria.

106.    Appellants appealed the District Commission's decision to this Court on August 8, 2014. The appeal was given Docket Number 113-8-14 Vtec (Hannaford Act 250 Appeal).

107. The Commerce Park subdivision originally received an Act 250 permit in 1987.

108. The 1987 Act 250 permit condition number 13 provides, "Permittee . . . shall maintain undisturbed 75 foot wide buffer areas between any filling, construction or other disturbances and the center line of the streams."

109. The project narrative of the 1987 land use permit application provides, "This subdivision is . . . intended for primarily local small scale and start-up businesses which are appropriate to the local scale of development."

110. Development of other lots in the Commerce Park subdivision has occurred within the 75 foot stream buffer.

111. There have been improvements in stormwater management technology and design over the past 27 years.

a. Stormwater

112. Patrick Brook runs along the northern edge of the Commerce Park subdivision.

113. A canal runs along the southeastern border of Lot 15 on the north side of Mechanicsville Road.

114. The Project is downgradient from the canal preventing runoff from the Project from discharging into the canal.

115. Lot 15 is not located in the flood plain of Patrick Brook or the LaPlatte River, but surface water from Lot 15 along with runoff from the other lots in the Commerce Park subdivision discharges into Patrick Brook.

116. Patrick Brook drains into the LaPlatte River approximately a half mile downstream from the Project site.

117. There is a wetland in the Project area.

118. Stormwater management measures for prior development within the Commerce Park subdivision include a stormwater detention pond between Lots 2 and 3 of the subdivision on the north side of Commerce Street, a 15-inch culvert under Commerce Street, and a stormwater swale running north-south along the western boundary of the Dark Star lot (the North-South swale).

119. Currently, any stormwater runoff from the existing undeveloped site drains to the north. Runoff flows into the North-South swale and then through the 15-inch culvert under Commerce

11

Street into the detention pond between Lots 2 and 3, where it finally discharges into Patrick Brook.

120. The Project will create an additional 2.69 acres of impervious surface, resulting in a total of 2.88 acres of impervious surface for Lot 15.

121. The Project does not involve the handling of harmful chemicals, beyond typical grocery store products.

122. Contaminants in stormwater runoff will largely be attributable to petroleum and other residues that leak from vehicles onto the parking areas.

123. The Project design includes a stormwater management system to accommodate stormwater runoff from the 2.88 acres of impervious surface. This system collects stormwater through a series of catch basins and conveys the water for on-site treatment and detention, with eventual discharge into Patrick Brook through a detention pond and outlet structure between Lots 2 and 3.

124. Stormwater systems in Vermont are designed to handle a varying degree of storm based on the size of a project and the amount of impervious surface it will create.

125. Storms are classified as 1-year, 10-year, 25-year, 50-year, and 100-year storms. This relates to the probability of such a storm occurring in any one year. For a 1-year storm, it is predicted that at least one will occur each year, whereas, for a 100-year storm, there is a 1% chance in any given year that a 100-year storm will occur. The less probable the storm, the greater its strength.

126. A 1-year storm is considered 2.1 inches of rain in any 24-hour period.

127. A 10-year storm event is measured as 3.2 inches of rainfall in any 24-hour period.

128. A 100-year storm is 5.2 inches of rain in a 24-hour period.

129. Applicant's stormwater system is designed to treat the majority of pollutants in all stormwater and to capture and convey up to the 25-year storm event to the detention pond between Lots 2 and 3.

130. The majority of contaminants contained in stormwater runoff are contained in the first 0.9 inches of rain to fall, known as the "first flush."

131. ANR requires that Applicant meet the Water Quality Volume Treatment Standard which requires that Applicant's stormwater system capture 90% of the 1-year storm.

132.    All stormwater from the Project is collected through a series of catch basins and is piped to one of two detention systems, each equipped with an ADS HDPE water quality unit for pretreatment of the one-year storm volume.

133.    The ADS HDPE unit is capable of removing 80% of total suspended solids (TSS), 80% of oil and grease, 40% of phosphorus, and 74% of heavy metals from the 1-year storm.

134.    The ADS Unit has a bypass system that diverts water flows above the 1-year storm to the underground detention chambers located under the parking area.

135.    One storage chamber is located beneath the eastern side of the parking lot, adjacent to the canal path, and the other is located under the northern parking lot.

136.    These detention chambers are equipped with outlet structures to regulate the release of stormwater volumes up to the 10-year storm event.

137.    The system will release the peak discharge of the 10-year storm at a rate that is less than the 10-year pre-development peak discharge rate.

138.    From the storage chambers, stormwater will flow to catch basin #13.  Catch basin #13 serves as a splitter, diverting stormwater associated with the 1-year storm to an east-west grass surfaced swale located along the northern boundary of Lot 15 (the East-West swale).

139.    Stormwater volumes above the 1-year storm are diverted by catch basin #13 to a 640-foot 18-inch pipe that runs down the Commerce Street Extension and under Commerce Street emptying into the detention pond between Lots 2 and 3.

140.    Water in the detention pond discharges into Patrick Brook through a swale on the north side of the detention pond.

141.    Applicant will upgrade the detention pond between Lots 2 and 3.

142.    The proposed East-West swale is 8 feet wide, 18 inches deep, 210 feet long, and has a 3:1 slope.  The East-West swale will treat stormwater as well as providing for groundwater recharge.  This swale has a minimum residence time of 14.1 minutes during a 1-year storm (meaning the swale will detain the peak flow of the 1-year storm for 14.1 minutes from the time of entry).

143.    The East-West swale provides additional water quality treatment and on its own is a sufficient treatment device meeting ANR's Water Quality Treatment Standard.

144.    The combination of the two treatment methods will effectively treat the majority of pollutants during all storm events, including the 25, 50, and 100-year events.

145.    From the East-West swale on Lot 15, stormwater will flow into the existing North-South swale.

146.    The North-South swale will remain unchanged.

147.    The North-South swale currently drains to a 15-inch culvert running under Commerce Street.

148.    The 15-inch culvert will be replaced with an 18-inch culvert.  The culvert will also be lowered in elevation by approximately 7.5 inches.

149.    The increased size of the culvert and lower elevation will convey a greater volume of water from the North-South swale and the Dark Star lot.  The larger size and lower elevation of the culvert will also increase the rate of discharge of the culvert by 4 cubic feet per second (cfs).

150.    During a 25-year storm, the storage chambers will fill to capacity and water will pool in the parking lot.  The pooling water will not run into the grass swale, but instead will drain through the chambers into the 18-inch pipe that leads to the detention pond.  At the peak of a 25-year storm, the detention pond will overtop, spilling directly into Patrick Brook.

151.    The Agency of Natural Resources determined that Applicant must meet the Water Quality Treatment Standard, Channel Protection Volume Treatment Standard, the Overbank Flood Protection Standard, and the Ground Water Recharge Treatment Standard.

152.    The Channel Protection Volume Treatment Standard requires 12 hours of extended detention for the 1-year, 24-hour storm.

153.    Applicant's proposed system meets this standard.

154.    The Overbank Flood Protection Standard requires that post-development peak discharge rate from the Project not exceed the pre-development peak discharge rate during a 10-year storm.

155.    Applicant's system meets the Overbank Flood Protection Standard.

156.    The Project does not need to comply with ANR's Extreme Flood Treatment Standard (requiring that post-development there is no increase in discharge rate over pre-development levels for 100-year storm) because the Project entails less than 10 acres of impervious surface (Project totals 2.88 acres), and the Project post-development does not increase the flood impact to adjacent lands.

157.    Stormwater flows, both pre- and post-development, were analyzed using hydrologic models.  HydroCad software was used, and the system was modeled with a sequential routing

method and a dynamic routing method. A dynamic routing method is best for a closed system of connected pipes and storage chambers where pressure can build up.

158. Flooding of adjoining properties will be reduced post-development in both the one and 10-year storms compared to current conditions.

159. For rain events above the 10-year storm and up to the 100-year storm, flooding on adjoining properties will be no worse than it is today.

160. During a 50-year or 100-year storm, runoff will fill the underground storage chambers and then overflow into the grass channels. Flooding will occur on the Dark Star lot, but no worse than existing conditions during comparable storms.

161. Downstream of the Project, Patrick Brook flows under Route 116 through the #28 bridge culvert (Patrick Brook Culvert). The culvert is structurally sound, but is undersized to accommodate the volume of water in Patrick Brook during large rain events (50- and 100-year storms).

162. Pre-development, during a 100-year storm, modeling depicts the water level rising near to the elevation of Route 116.

163. Due to the Project's additional impervious surface, the total volume of water conveyed by the Brook post-development will increase.

164. The increase in peak discharge to the Brook that will result from the Project is between 14–16.77 cfs, which represents about 3-4% of the overall peak flow in the Brook.

165. During a 100-year storm event, the Brook's peak discharge rate is about 420 cfs, and this occurs at 12:45 during the theoretical 24-hour storm.

166. The Project's peak discharge rate into Patrick Brook occurs at 12:06.

167. Because the peak discharge from the Project precedes the peak flow of the Brook, the peak flows are not additive.

168. At most, the Project will increase the peak flow of the Brook between 3-4%.

169. During the construction phase, Applicant will use a series of temporary erosion control measures and will construct the Project in phases to minimize erosion. Applicant has received a construction phase stormwater discharge permit from ANR. Appellants did not appeal the construction phase discharge permit.

170. The Project is designed with permanent erosion control measures such as vegetation covers and impervious surfaces to control erosion during operation.

171. The Project's stormwater system's controlled release of stormwater reduces the erosion impacts from runoff.

b. Traffic

172. The area analyzed for traffic impacts from the Project (the Project impact area) covers the Route 116/CVU Road intersection to the north, and extends south for about a mile to the Route 116/Silver Street intersection. This area includes the intersections of Route 116 and Commerce Street; Route 116 and Mechanicsville Road; and Route 116 and Charlotte Road. Most of these intersections are predicted to accommodate at least 75 new trips during the peak evening commute hour.

173. The Project will generate 386 trips ends per hour at the weekday peak p.m. hour.

174. The p.m. peak hour correlates to the busiest evening commute hour (4:30 to 5:30 p.m.).

175. Recent traffic counts in the Project impact area show that growth in traffic volume is nearly flat, most intersections and roadways have not seen increased traffic numbers.

176. Four high crash locations (HCLs) have been identified within the Project impact area.

177. A HCL is a location having an actual crash rate exceeding the "critical crash rate," meaning the area must have experienced five or more accidents over a five-year period in a 0.3 mile stretch of road.

178. A HCL designation does not definitively determine that the section of roadway is unsafe. Rather, the designation is a screening device transportation agencies use to identify road sections that may be suitable for further analysis.

179. The Route 116/CVU Road intersection has been identified by Vermont Agency of Transportation (VTrans) as a HCL.

180. Three additional HCLs exist further south on Route 116; one in the area just north of the Route 116 and Commerce Street intersection, another along the segment of Route 116 between Mechanicsville Road and Charlotte Road, and the third in the area of the Route 116 and Charlotte Road intersection.

181. Many of the recorded accidents were low-severity rear-end collisions of the type that occur in stop and go traffic.

182. Traffic congestion is a frequent problem along Route 116 in Hinesburg during both morning and afternoon commute times.

16

183. VTrans measures congestion and traffic delays through a level of service (LOS) rating system—A to F (F being the worst).

184. Generally, it is VTrans's policy to maintain roadways and signalized intersections at an LOS of C or above. For unsignalized intersections, an LOS of D is acceptable.

185. Applicant's traffic expert, Mr. Dickinson, generated a background traffic volume for the roadways and intersections of the Project impact area and used this to assess traffic impacts with and without the expected increase from the Project.

186. In order to generate the background volume, Mr. Dickinson used traffic counts in Hinesburg from 2008, as this was the more conservative (higher) traffic count data available, and then assumed a 3% average growth projected out to year 2019. Included in this background traffic volume are newly generated trips from nearby approved residential and commercial developments. The projected 2019 background volume represents the traffic scenario without the Project (no-build).

187. Mr. Dickinson then included the additional peak hour trips that will be generated by the Project to the predicted 2019 traffic volumes (build/post-development scenario).

188. Using traffic turning simulation software (Highway Capacity Software and Synchro), Mr. Dickinson assessed the LOS for the intersections in the Project impact area for both the build and no-build scenarios.

189. In addition to modeling, observed traffic patterns and delays were incorporated into Applicant's traffic analysis.

190. The Commerce Street/Route 116 intersection currently has a marginal LOS.

191. In the no-build scenario, the Commerce Street westbound right-turn and through lanes have LOS D. Post-development, without mitigation, they will likely degrade to LOS E.

192. The Route 116 southbound left-turn lane is LOS D in the no-build scenario and is predicted to remain at this level with the Project.

193. The un-signalized Route 116/Mechanicsville Road intersection currently experiences significant delays and congestion, and has an LOS F in the no-build scenario.

194. The Mechanicsville Road westbound lane for right and left turning traffic is LOS F in the no-build, and is predicted to remain at LOS F post-development.

195. The Charlotte Road/Route 116 intersection currently experiences significant congestion with southbound traffic often backing up at the intersection to north of Commerce Street and

occasionally north to Riggs Road beyond the Patrick Brook Culvert under Route 116. The signal at the Route 116/Charlotte Road intersection currently uses split phasing for east-west traffic (meaning that east and westbound traffic have an independent signal phase).

196.    In the no-build scenario, with split phasing maintained, the intersection is LOS F.

197.    At the southern edge of the Project impact area, the Silver Street intersection with Route 116, which underwent improvements in 2009, is predicted to have an LOS D in the no-build scenario.

198.    The Silver Street intersection is on the edge of quantifiable Project traffic impacts.

199.    Based on actual observations, the traffic models for the build and no-build scenarios do not accurately account for gaps in Route 116 traffic that will be created by signal delays at the Route 116 Charlotte Road traffic signal. With these gaps, vehicles backed up on Silver Street will be able to safely turn left onto Route 116, reducing delays.

200.    When these observed conditions were accounted for, the Silver Street intersection remained at an LOS D post-development.

201.    Applicant proposes several mitigation measures with a focus on the Route 116 Commerce Street intersection.  These measures, outlined in more detail in Mr. Dickinson's Traffic Impact Analysis (TIA), see Applicant's Ex. 28 and 29, include:

> a) Increasing the length of the southbound Route 116 left-turn lane at Commerce Street from 75 feet to 185 feet.
>
> b) To accommodate the Route 116 left-turn lane, the taper distance shall be 100 feet from the turn lane with an 85 foot centerline offset in advance of the taper.
>
> c) Extending the westbound right-turn lane on Commerce Street from 80 feet to 270 feet.
>
> d) The westbound left-turn/through lane stop bar on Commerce Street will be moved back 25 feet to accommodate left-turning southbound traffic.
>
> e) Relocating the curb cut for the Firehouse Plaza farther east on Commerce Street away from the Route 116 intersection.
>
> f) Concurrent signal phasing for eastbound/westbound traffic at the Route 116/Charlotte Road intersection and increasing the north/south green signal time.  Accompanying this signal adjustment, Applicant will relocate the stop bar and sidewalk at the Lantman's entrance.

18

g) Installing sidewalk along south side of Commerce Street to connect the existing sidewalk to Route 116, as well as installing sidewalks within the Project area to allow pedestrian access from Mechanicsville Road and Commerce Street.

h) Providing a $25,000 Project impact fee to be used for signalization of the Mechanicsville Road/Route 116 intersection.

i) Deliveries by vehicles of WB-62 size or larger will be limited in the following ways: Trucks traveling south along Route 116 shall not make deliveries to the Hannaford between 7:00–9:00 a.m. and 3:00–6:00 p.m. on weekdays; trucks traveling north along Route 116 shall at all times enter the site via Mechanicsville Road.

202.  With the proposed concurrent phasing and extended green light, the Route 116 and Charlotte Road intersection is LOS D post-development.

203.  The Route 116 Shelburne Falls/CVU Road intersection is designated as a VTrans safety improvement project, which will include designated left-turn lanes, an exclusive right-turn lane on Shelburne Falls Road, and new signalization equipment.

204.  Recently, the speed limit on Route 116 just south of Patrick Brook was reduced from 40 to 30 mph.

205.  The signals at the Route 116/Commerce Street and Route 116/Charlotte Road intersections currently have an exclusive pedestrian phase (all traffic stops while pedestrians cross).

206.  With the Project's additions to the sidewalk infrastructure, pedestrians will be able to connect from Mechanicsville Road to Route 116 along designated pedestrian routes.

207.  The sidewalk along Mechanicsville Road currently extends all the way to CVU Road.

c.    Municipal Services

208.  Applicant received a wastewater and potable water supply permit on August 7, 2013.

209.  The Town approved a wastewater treatment capacity allocation of 1,960 gallons per day.

210.  Subsequently, the Town informed Applicant that the allocation had been revoked because Town did not have the capacity to meet the allocation and had been directed by the State to place a moratorium on all new hookups.

211. The Town is working to resolve its capacity issues through the installation of new filtration systems and a series of new wells. As soon as these measures are in place and the water supply issue resolved, Applicant's allocation will automatically be renewed.

212. The Town does not currently own an aerial ladder truck as part of its fire department fleet. With its current fleet, the Hinesburg Fire Department is incapable of fully serving the proposed Hannaford building.

213. There are several other existing buildings in Hinesburg, including CVU High School, that cannot be fully served by the Hinesburg Fire Department.

214. The Town participates in a mutual aid agreement with the fire departments of surrounding towns, several of which, such as Essex, have an aerial ladder truck capable of servicing the larger buildings in Hinesburg, including the proposed Hannaford building.

215. The Town plans to purchase a truck with ladder capabilities in the near future.

216. Applicant will pay $19,000 as a fire impact fee that will aid in the acquisition of a ladder truck.

### d. Aesthetics

217. There are no historic sites or rare or irreplaceable natural areas at the Project site or in the surrounding area.

218. Lot 15 is one parcel within the 15-lot Commerce Park subdivision, an area zoned for commercial and light industrial uses with commercial enterprises on every lot of the subdivision.

219. The character of the area is one of a mix of commercial uses, without any clear architectural theme or significant aesthetic character.

220. Bordering Lot 15 on its northwestern corner is a two-story flat-roofed commercial building owned by Dark Star Lighting.

221. To the northeast, two of the newer buildings in the subdivision are a post office and National Bank of Middlebury.

222. On the north side of Commerce Street, across from Lot 15, is Tailhook Towing and a self-storage operation consisting of several prefabricated long rectangular structures divided into individual self-storage units.

223. Nearby, although not part of the Commerce Park subdivision, is the 76,000-square-foot NRG building and the 86,000-square-foot former Saputo Cheese Plant.

20

224. The proposed Hannaford building is designed specifically for the location, and the design incorporates cues from the surrounding area. The design was undertaken by a local architecture firm.

225. Although the building at 36,000 square feet is larger than those immediately adjacent to it, many of the lots in the Commerce Park subdivision have little landscaping and are prominently visible from Commerce Street and parts of Route 116.

226. Any one side of the building is no longer than several store fronts in the subdivision, and the store will be offset so the full length of any one side will not parallel a roadway.

227. With the existing trees and proposed landscaping, both the store and associated parking lot will be substantially screened from Route 116 and Mechanicsville Road, and it will be setback from Commerce Street with plantings to soften the view.

228. A covered walkway on three sides of the building and a hipped roof help break up the rooflines and diminish any big box store appearance.

## VII. Wetlands

229. Wetlands in Vermont are classified as Class I, II, or III.

230. Class I wetlands are the most significant and are designated through ANR's rulemaking process.

231. Class II wetlands are designated in three ways: 1) by being mapped as a Class II wetland on the Vermont Significant Wetland Inventory maps; 2) by meeting a presumption of significance outlined in the Vermont Wetland Rules (VWR), e.g., by being contiguous to wetlands shown on the Vermont Significant Wetlands Inventory maps or being larger than a half-acre in size; or 3) by ANR specially determining that the wetland warrants Class II protection under the VWR.

232. A Class III wetland meets the three criteria for wetland designation outlined in the VWR—soils, vegetation, and hydrology—but does not rise to the level of significance of a Class I or Class II wetland.

233. The wetland on Lot 15 is about 1.7 acres in size and thus was presumed to be a Class II wetland.

234. In order to develop the site, Applicant plans on filling in a portion of the wetland and installing stormwater management and other mitigation measures. A portion of the wetland will remain after the Project is completed.

21

235.  According to the Vermont Wetland Rules (VWR), construction activities are prohibited in a Class I or Class II wetland unless they are authorized by a permit from ANR.

236.  The VWR do not require a permit for construction activities in a Class III wetland.

237.  In February of 2013, Applicant submitted a wetland determination petition for the Lot 15 wetland to ANR's Department of Environmental Conservation Wetlands Program.[3]

238.  The petition was deemed complete on February 4, 2013.

239.  Appellants opposed reclassification by writing letters to ANR and participating in hearings before the Agency through their attorney.

240.  Agency personnel conducted two site visits with Applicant and its representatives.

241.  Applicant did not permit Appellants to enter the property for these visits.

242.  At two public meetings, Appellants presented expert testimony regarding the values served by the wetlands that they alleged would be harmed by the reclassification.

243.  Appellants also submitted documents to ANR after the public hearings arguing why, under the Vermont Wetland Rules, the wetland at issue should remain a Class II wetland.

244.  On April 2, 2014, ANR issued a written decision determining that the wetland should be classified as a Class III wetland.

245.  Appellants requested that ANR reconsider this decision, and ANR denied the request to reconsider on May 7, 2014.

246.  On May 27, 2014, Appellants appealed ANR's wetland determination decision to this Court.

247.  The appeal was given Docket Number 73-5-14 Vtec (Hannaford Wetlands Appeal).

248.  The main body of the wetland on Lot 15 is in the southeastern portion of the lot.

249.  The wetland is about 1.7 acres in size and is largely an open wet meadow.  The wetland is surrounded by development and is occasionally mowed to control height of the grass that grows in the wetland and adjoining upland (non-wetland) areas.

250.  Mechanicsville Road runs along the southeastern border of Lot 15.

251.  A man-made canal separates Lot 15 from Mechanicsville Road.

---

[3] The Department of Environmental Conservation (DEC) is part of the Vermont Agency of Natural Resources.

252. A man-made berm forms the northern edge of the canal, and on the north side of the canal an elevated paved pedestrian path (the canal path) separates the wetland area from the canal.

253. The wetland is lower in elevation than the canal and does not drain into the canal.

254. The Lot 15 wetland is not adjacent to any navigable water.

255. To the north of the wetland, on the north side of Commerce Street, Patrick Brook runs in an east-west direction. The wetland drains into Patrick Brook through a series of ditches, swales, and culverts, but is physically separated from Patrick Brook by upland areas and by Commerce Street.

256. The wetland does not retain any open water areas.

257. The wetland vegetation is dense but is largely reed canary grass, an invasive species.

258. The wetland is predominantly flat, sloping slightly from the southeast to northwest.

259. The wetland lies within a "source protection area," i.e., an area that contributes to a drinking water source.

260. A thick clay layer below the soil surface of the wetland impedes surface water from draining into groundwater.

261. According to Town and Federal Emergency Management Agency (FEMA) mapping, the wetland is not within a flood hazard area.

262. There is ditching along the western edge and in the northwest corner of the wetland, which leads to a culvert under Commerce Street. The ditching and culvert are part of the original stormwater control measures installed for the Commerce Park subdivision. The wetland drains into Patrick Brook through this stormwater infrastructure. Applicant will upgrade the existing culvert under Commerce Street and a stormwater detention pond on the north side of Commerce Street as part of the Project.

263. Post-development, surface water flowing off the remaining portion of the wetland will be conveyed to Patrick Brook through the Project's stormwater system or through the existing stormwater infrastructure.

264. Most of the impervious surface in the Commerce Park subdivision is north and downgradient from the wetland; thus, most of the runoff from the subdivision flows away from Lot 15. Much of the stormwater from the subdivision reaches Patrick Brook through man-made ditches, swales, and culverts and does not pass through the wetland.

23

265. To the north of Lot 15 is the adjacent Dark Star property (Lot 11 and 12 of the Commerce Park subdivision). The Dark Star property has a history of flooding. The flooding on Dark Star exists largely because of site conditions independent of the Lot 15 wetland.

266. The main portion of the upgradient watershed is located to the northeast of the Lot 15 wetland. Much of the watershed is forested, and within the watershed there are large wetlands contiguous to streams that store a comparatively larger amount of floodwater than the Lot 15 wetland.

267. The Lot 15 wetland does not receive significant runoff from the surrounding watershed.

268. The existing development in the Commerce Park subdivision and ditching in and around the northwestern portion of the wetland has degraded the wetland.

269. The wetland is within the LaPlatte River watershed.

270. The Department of Environmental Conservation has identified the LaPlatte River as an impaired waterway because it exceeds acceptable E. coli bacteria levels under Vermont's water quality criteria.

271. Patrick Brook drains into the LaPlatte River.

272. The wetland is over half a mile away from the LaPlatte River.

273. There is no source of contamination near the wetland, and surface waters that enter the wetland are not contaminated with E. coli.

274. There are no Class A surface waters in Hinesburg.

275. Surface water from the wetland flows through a grass channel on Lot 11 before entering Patrick Brook. This channel also filters surface runoff.

276. There are no rare or threatened species that inhabit the wetland.

277. There is no hunting or fishing that occurs in or near the wetland.

278. The wetland does not provide any plants that can be harvested for food.

## CONCLUSIONS OF LAW

Both Applicant and Appellants filed statements of questions establishing our scope of review in this matter. Applicant only raises two questions, challenging the need for certain limitations on truck traffic and on the allowable construction hours.[4] These two questions went

---

[4] Applicant's Question 1 asks whether we should adopt a revised finding to the District Commission's Finding #9 by finding, "Construction operations will typically occur during normal working hours between 7:00 a.m. and 6:00 p.m., Monday through Friday. Noise will be limited to standard construction equipment. Activities that

24

largely unsupported and will only be addressed where appropriate in our discussion of pertinent Act 250 criteria.[5] Appellants raise 32 questions that challenge the substance and procedure of Applicant's Act 250 permit application. Prior to trial, we answered Appellants' Questions 8 and 9 concerning the necessity of the Town to be a co-applicant in our October 27, 2015 decision. See In re Hinesburg Hannaford CU Approval, Nos. 129-9-12, 163-11-12, 68-5-14, 69-5-14, 70-5-14, 73-5-14, and 113-8-14 Vtec, slip op. at 6–7 (Vt. Super. Ct. Envtl. Div. Oct. 27, 2015) (Walsh, J.). Appellants raise a similar issue in Questions 10 and 11, claiming that the owner of the Dark Star property was a necessary co-applicant under Criterion 10. Because the revised plans no longer involve land owned by Dark Star, we answer Appellants' Questions 10 and 11 by concluding that Dark Star is not a necessary co-applicant.

We interpret the remainder of Appellants' questions to address the following two general issues: first, whether Applicant should be permitted to amend the prior Act 250 permit under Stowe Club Highlands; and second, whether the Project complies with Act 250 Criteria 1, 1(B), 1(E), 4, 5, 7, 8, 9(K), and 10. We address these issues in turn.

## I. Is Applicant Entitled to Seek an Amendment to the 1987 Act 250 Permit?

Appellants' Questions 1–5 challenge Applicant's ability to seek an Act 250 permit amendment to the original 1987 Act 250 permit for the Commerce Park subdivision. We consider the permissibility of Act 250 permit amendments under a three-step analysis known as the Stowe Club Highlands test, originally discussed by our Supreme Court in In re Stowe Club Highlands and later codified as Rule 34(E) of the Natural Resources Board Act 250 Rules. 166 Vt. 33, 38–40 (1996); Act 250 Rules, Rule 24(E). "The doctrine effectively balances a need for finality with enough flexibility to cope with changes in law or circumstances." In re Stowe Highlands Merger/Subdivision, No. 35-3-11 Vtec, slip op. at 5 (Vt. Super. Ct. Envtl. Div. Feb. 15, 2012) (Walsh, J.), aff'd, 2013 VT 4, 193 Vt. 42).

---

create unusual levels of noise will be confined to these time frames. Interior Construction may occur at other times." Applicant's Statement of Questions (SOQ) at 1, filed Oct. 21, 2014. Applicant's Question 2 questions whether a limitation of the allowable delivery times for trucks is necessary.

[5] Applicant offered no reason why we should revise the District Commission's Finding #9, which limited construction activities to weekdays between the hours of 7:00 a.m. and 6:00 p.m. Because of Applicant's failure to introduce evidence in support of Question 1, we find no reason to revise the District Commissions finding as to the allowable hours for construction activities.

Under this analysis, the threshold question is "whether the applicant proposes to amend a permit condition that was included to resolve an issue critical to the issuance of the permit." Act 250 Rules, Rule 34(E); see also In re Ashford Lane HOA Act 250 App., No. 69-5-13 Vtec, slip op. at 3 (Vt. Super. Ct. Envtl. Div. Dec. 6, 2013) (Walsh, J.). This determination is case-specific. Id. If the condition was not included to resolve a critical issue, then the applicant is entitled to seek an amendment. If we find the condition was critical to the issuance of the permit, we must then "consider whether the [applicant] is merely seeking to relitigate the permit condition or to undermine its purpose and intent." Act 250 Rules, Rule 34(E)(2). Where an applicant is only seeking to relitigate or undermine the condition, then the analysis ends and the applicant is not entitled to seek an amendment. Finally, if the applicant is not merely seeking to relitigate or undermine the condition, then we must weigh the competing goals of finality and flexibility based on an enumerated list of factors laid out in Rule 34. These are, in relevant part:

(a)     changes in facts, law or regulations beyond the permittee's control;
(b)     changes in technology, construction, or operations which necessitate the need for the amendment;
(c)     other factors including innovative or alternative design which provide for a more efficient or effective means to mitigate the impact addressed by the permit condition;
(d)     other important policy considerations, including the proposed amendment's furtherance of the goals and objectives of duly adopted municipal plans;
(e)     manifest error on the part of the district commission, the environmental board, or the environmental court in the issuance of the permit condition; and
(f)     the degree of reliance on prior permit conditions or material representations of the applicant in prior proceeding(s) by the district commission, the environmental board, the environmental court, parties, or any other person who has a particularized interest protected by 10 V.S.A. Ch. 151 that may be affected by the proposed amendment.

Act 250 Rule 34(E)(4).

Here, Appellants raise two provisions of the 1987 Act 250 permit that they argue bar the project as proposed. The first is found in condition 13 of the 1987 Act 250 permit and provides, "Permittee . . . shall maintain undisturbed 75 foot wide buffer areas between any filling, construction or other disturbances and the center line of the streams." Appellants' Ex. Courtney A at 4. The second is a statement in the project narrative of the Act 250 permit application that

26

was submitted to the District Commission and explains, "This subdivision is . . . intended for primarily local small scale and start-up businesses which are appropriate to the local scale of development." Id., Project Narrative at 1. Appellants argue that the Project violates both provisions; the proposed store and parking lot are within 75 feet of the canal,[6] and the Project is not small-scale or a startup. We address these arguments in reverse order and conclude that the application is not barred under Stowe Club Highlands or Rule 34.

Regarding the statement about local small-scale development, there is no evidence that this statement, buried in the project narrative that was submitted as part of the land use permit application, provides a condition of the permit. Rather, the statement offers a generalized aspirational goal that by its terms is not a prerequisite for development. While the goal that the subdivision should *primarily* be comprised of small-scale local businesses may be commendable, it does not provide an express permit condition and thus is not subject to our Stowe Club Highlands analysis. See In re Stowe Highlands Merger/Subdivision, No. 35-3-11 Vtec, slip op. at 5 (Vt. Super. Ct. Envtl. Div. Feb. 15, 2012) (Walsh, J.) ("Conditions not stated in a permit . . . cannot be imposed on the permittee."). Therefore, we conclude that the statement in the project narrative does not bar the permit application.

On the other hand, the 75-foot setback requirement does appear to provide a clear permit condition. Therefore, we must first consider whether the 75-foot setback was critical to the issuance of the 1987 permit. To begin, we note there is no express reason for the 75-foot setback in the 1987 permit. It could be that the setback was included as a water quality and watershed protection measure. Even with this understanding, however, it is not clear whether the inclusion of the 75-foot setback was critical.

Cutting against a finding that the condition was critical to the issuance of the permit, the 75-foot setback condition was amended or altered for at least three of the existing developments within the Commerce Park subdivision, including development within a year of the original Act 250 permit. See Applicant's Ex. 85 at 5 (allowing 30-foot buffer). Further, in granting approval to projects that significantly amended the condition, the District Commission devoted little analysis and gave no explanation for the amendments. See Applicant's Ex. 86 at 3

---

[6] Appellants argue that because the 1987 permit references streams (plural), the canal should be considered a stream for purposes of the permit because there are only two water bodies that could be considered streams within the Commerce Park subdivision—the canal and Patrick Brook. Applicant does not dispute that the canal should be considered a stream for the purpose of the 1987 permit and we therefore accept this assertion for our analysis.

(allowing 50-foot setback).  Such dismissive, frequent, and substantial amendment to the 75-foot setback does not support the claim that the condition was of critical importance to the 1987 Act 250 permit.  Even assuming the 75-foot setback requirement was critical to the 1987 permit, however, the current amendment is not necessarily prohibited.

Proceeding as if the condition was critical, we next ask whether Applicant merely seeks to relitigate or undermine the permit provision.  As the Environmental Board noted, every permit amendment application is in some sense the relitigation of an initial permit condition, yet we do not interpret the relitigation concept of Rule 34 so strictly.  See In re Dr. Anthony Lapinsky and Dr. Colleen Smith, Nos. 5L1018-4 and 5L0426-9-EB, Findings of Fact, Conclusions of Law, and Order, at 18 (Vt. Envtl. Bd. Oct. 3, 2003).  Rather, we "consider whether the motivation for seeking an amendment is to relitigate a condition or whether the applicant has presented some reasonable justification for the amendment application."  In re Ashford Lane HOA Act 250 Application, No. 69-5-13 Vtec, slip op. at 5 (Vt. Super. Ct. Envtl. Div. Dec. 6, 2013) (Walsh, J.).  Here, Applicant seeks to amend a 27-year-old permit condition, highlighting the significant changes in existing conditions since the permit was granted.  We find such justification reasonable and are convinced that Applicant is not merely seeking to relitigate the setback condition.

We therefore move on to step three.  That is, whether, considering the factors laid out in Rule 34, flexibility in the permitting process warrants granting the permit amendment.  We conclude that it does.  First, the current factual situation is significantly different than it was in 1987.  The Commerce Park subdivision is now almost entirely developed and many of the developments encroach within 75 feet of the streams.  Secondly, there have been improvements in stormwater management technology and design over the past 27 years, suggesting that the canal will be adequately protected with a modified setback.  Additionally, there are numerous other standards within the Regulations and Act 250 that ensure water quality and waterway protection.  Lastly, policy and equity considerations counsel for flexibility.  The encroachment is not unreasonable—at its closest point, the exterior of the building will be about 65 feet from the canal with the roof overhang coming to within about 42 feet of the canal.[7]  The proposed location will not adversely impact water quality—the Project is

---

[7] These distances represent the southeastern most corner of the building.  All other portions or the building are farther from the canal.

28

downgradient from the canal preventing runoff from the Project from discharging into the canal.  And, the enforcement of the 75-foot setback here would be inequitable—numerous other developments within Commerce Park have not been held to the setback, some encroaching to within 30 feet of Patrick Brook.

We therefore conclude that an amendment to the 1987 Act 250 permit's 75-foot setback requirement is permissible and warranted under Stowe Club Highlands and Rule 34, thus answering Appellants' Questions 1, 2, and 3.  Because we reach the conclusion that an amendment to the 1987 Act 250 permit is permissible and warranted, we also deny Section 3 of Appellant's Motion for Entry of Judgment.[8]

Appellants also challenge Rule 34's applicability to this 1987 permit, arguing that Rule 34 cannot retroactively supersede the Stowe Club Highlands test, and if Rule 34 was intended to supersede Stowe Club retroactively, the Environmental Board has exceed its authority, or alternatively, the delegation of its authority is unconstitutional under Chapter II Sections 5 and 37 of the Vermont Constitution.[9]  Appellants' assertions are unsupported and we conclude that there is no violation of retroactivity principles in applying Rule 34 to the current case.[10]

To begin, the outcome here would be the same under Rule 34 or the Stowe Club Highlands doctrine.  Rule 34 was enacted to clarify and supplement the Stowe Club Highlands case law.  See In Re Dr. Anthony Lapinsky and Dr. Colleen Smith, Findings of Fact, Conclusions of Law, and Order, at 14 (Vt. Envtl. Bd. Oct. 3, 2003).  Substantively, our analysis is the same under Stowe Club Highlands and Rule 34.  Therefore, even if we analyzed the permit amendment

---

[8] Appellants moved for an entry of judgment upon the close of Applicant's case. In Section 3 of the motion, Appellants argue that there was insufficient evidence upon which positive findings could be based under Stow Club Highlands or Rule 34.

[9] There is no separation of powers concern involving Rule 34. 10 V.S.A. § 6025 clearly grants the Environmental Board rulemaking authority in the Act 250 context. There is nothing impermissible in the delegation of rulemaking authority to Environmental Board and the Board's promulgation of rules for the administration of Act 250 is valid and the rules enforceable. See In re Spencer, 152 Vt. 330, 337 (1989) (affirming the Board's authority to promulgate rules governing Act 250).

[10] Appellants also unsuccessfully argue that applying Rule 34 retroactively violates Chapter 1 Article 4 of the Vermont Constitution as well as the Contract Clause of the United States Constitution. To the extent Appellants seek to raise due process concerns under Chapter 1, Article 4 of the Vermont Constitution or a claim under the Contract Clause of the United States Constitution, their arguments are unsupported and unclear, and as a result, we will not search for legal authority to interpret and support them. See In re Ferrera & Fenn Gravel Pit Application, No. 159-9-10 Vtec, slip op. at 4 (Vt. Super. Ct. Envtl. Div. Nov. 13, 2013) (Durkin, J.) (citing V.R.E.C.P. 5(a)(2); V.R.A.P. 28(a)(4); In re Boardman, 2009 VT 42, ¶ 20, 186 Vt. 176). Furthermore, it is well established that a third party may not assert the rights of another. See Schievella v. Dep't of Taxes, 171 Vt. 591, 592 (2000). Appellants have failed to put forth any argument establishing that they as individuals have a constitutionally protected interest at stake that is impacted by the application of Rule 34 to the current permit amendment.  See In re New Cingular Wireless PCS, LLC, 2012 VT 46, ¶ 12, 192 Vt. 20.

purely under the <u>Stowe Club Highlands</u> judicial doctrine, we conclude that the amendment is permitted. Moreover, it is unclear how there is a retroactivity problem. Rule 34 was adopted well before Applicant's Act 250 permit application. Rule 34 directs how we are to analyze permit amendment questions, but does not substantively alter a vested right or impair an obligation established by contract. See <u>Myott v. Myott</u>, 149 Vt. 573, 576 (1988) (noting that retroactivity is a concern where application of the rule would affect a pre-existing "right, privilege, obligation or liability"). We therefore answer Appellants' Question 4 and 5 by concluding that there is no retroactivity issue in considering Rule 34 and that the Environmental Board has not exceeded its authority.

## II.    **Act 250 Criteria**

### a.    <u>Stormwater and Water Quality (Criterion 1, 1(B), 1(E), and 4)</u>

Questions 12–20 of Appellants' Statement of Questions challenge the Project because of its stormwater impacts, arguing that the Project does not comply with Criteria 1, 1(B), 1(E), and 4. We address the Project's compliance with each criterion in turn. We do note at the outset that Applicant does not currently have a water quality permit from ANR, and thus there is no presumption of compliance under Act 250 Rule 19(F). Nevertheless, the fact that Applicant's permit is pending does not curtail our ability to independently assess, based on the evidence presented, Applicant's compliance with Act 250's water quality provisions.

#### i.    Criterion 1 (Question 12)

Act 250 Criterion 1 requires applicant to show that their project will not cause "undue water or air pollution." 10 V.S.A. § 6086(1). Whether pollution is "undue" is highly fact-specific. We are directed to consider "the elevation of the land above sea level . . . the slope of the land and its effect on effluents; the availability of streams for disposal of effluents; and the applicable Health and Environmental Conservation . . . regulations." <u>Id</u>. While we do not have a clear standard to determine what constitutes "undue" water pollution, it is clear that all impacts are not prohibited outright.

Lot 15 is located in a Class III wetland and is composed of mainly hydrologic soils. Lot 15 is not located in the flood plain of Patrick Brook or the LaPlatte River, but surface water from Lot 15 along with runoff from the other lots in the Commerce Park subdivision discharges into Patrick Brook. The Project will result in an increase of 2.69 acres of impervious surface, for a

total of 2.88 impervious acres.  Due to this increase, greater amounts of stormwater will flow off Lot 15 to Patrick Brook post-development.

Appellants challenge the Project's compliance with Criterion 1, claiming it will result in undue water pollution due to the volume of stormwater that the Project will generate and due to the pollutants the stormwater will carry.  Many of Appellants' arguments relating to flooding and the adequacy of the stormwater system are more fully dealt with in our discussion of Criterion 1(E) and Criterion (4) below.  Here, we provide an overview of Applicant's stormwater system and consider its ability to manage water pollution.

Applicant's stormwater system has been designed to comply with the Vermont Stormwater Management Rules and the Vermont Water Quality Standards with reliance on the Vermont Stormwater Management Manual (VSMM).  Applicant received a stormwater permit from ANR under a prior design, but the current system as proposed has not received a permit.[11] Applicant argues that it is entitled to a partial presumption for those aspects of the system that remain unchanged.  Such a piecemeal approach is incorrect and fails to acknowledge that a stormwater system is the sum of its component parts.  Applicant's prior permit addressed a stormwater system distinct from what is currently proposed.  As a result, Applicant's system is entitled to no presumption, and we will consider all the evidence before us and reach an independent decision.

Under ANR's stormwater rules, the Project's stormwater system is only required to treat and manage water volumes up to the 10-year storm event.[12]  The system, however, will effectively treat the majority of pollutants during all modeled storm events including 25, 50, and 100-year events.  Treatment is achieved because the majority of contaminants contained in stormwater runoff are contained in the first 0.9 inches of rain to fall, known as the first flush. As rain falls, it picks up chemicals, oils, sediments, and other pollutants that have been spilled or collected on impervious surfaces.  Most of these contaminants are carried away in the first flush, thus additional rain beyond the first flush does not contain significant levels of contaminants.  As a result, treatment methods are often not designed to treat rainfall amounts above the first flush.

---

[11] The permit was remanded due to the re-location of the grass swale from off-site onto Lot 15.

[12] ANR also required Applicant demonstrate that it would not make flooding conditions worse during the 100-year storm than as they exist today.

Applicant's system uses a series of catch basins to direct stormwater volumes up to the 1-year storm through two treatment devices. The system directs the stormwater to an ADS HDPE water quality unit that is capable of removing 80% of total suspended solids (TSS), 80% of grease and oil, 40% of phosphorus, and 74% of heavy metals. From the water quality unit, the stormwater is conveyed to storage chambers and then to catch basin #13 where it is discharged into a 210-foot long, eight-foot wide grass swale on Lot 15 (the East-West swale). The East-West swale has a residency time of 14.1 minutes, providing treatment and allowing groundwater recharge. The East-West swale, as proposed, is on its own a sufficient treatment device to meet State standards.[13] From the swale, the stormwater flows into the North-South swale on the Dark Star lot and under Commerce Street to the detention pond between Lots 2 and 3, where it is eventually discharged into Patrick Brook. The combination of the two treatment methods—the ADS HDPE unit and the grass swale—will ensure that stormwater flowing off Lot 15 is adequately treated.[14]

Appellants contend that the East-West swale will not operate as anticipated because it is located in a wetland and the bottom of the swale will be below the water table. They argue that there will constantly be stagnant water in the swale, preventing the grass necessary for filtration from growing and providing a breeding ground for mosquitoes and other pests. As proposed, the East-West swale is designed according to ANR's specifications and functional requirements. Applicant is obligated to install a treatment swale that meets the relevant criteria. Appellants' arguments are insufficient to establish that swale cannot function as proposed. Therefore, we conclude that the hypotheticals posed by Appellants do not constitute grounds to deny the Project under Criterion 1.[15]

In addition to treatment, the stormwater system must also manage the flow of stormwater to prevent flooding. As part of is stormwater management system, Applicant will replace the current 15-inch culvert under Commerce Street with an 18-inch culvert, as well as

---

[13] The VSMM provides details for the design and feasibility of grass swales to treat runoff from impervious surfaces. See ANR Ex. 3 at 2-45–2-54. Post construction, the swale must comply with the standards set forth in the VSMM. If it does not, Applicant must take remedial action.

[14] ANR requires that Applicant meet the Water Quality Volume Treatment Standard which requires that Applicant's stormwater system capture 90% of the first flush.

[15] Our positive findings under Criterion 1 are based on Applicant's representations that the swale will function properly. To be clear, our approval of the Project's stormwater system requires grass swale that functions in accordance with ANR's specifications and the design plans submitted by Applicant. If post-development the grass swale does not function properly, is plagued by standing water, or is overgrown with hydrophilic vegetation, Applicant is required to remedy the situation to achieve compatibility with the approved design.

lowering the bottom grade of the culvert by 7.5 inches.[16] This will improve drainage of the existing North-South swale, thus improving drainage from Lot 15 and the Dark Star lot. For storm events above the 1-year storm up to the 25-year storm, the system will convey the water away from the Dark Star lot into underground storage chambers and then to an underground 18-inch pipe that runs down the Commerce Street Extension to the detention pond north of Commerce Street between Lots 2 and 3. As a result of the improvements, flooding on Lot 15 and the adjacent Dark Star lot will improve post-development in both the 1- and 10-year storm events, and for rain events above the 10-year and up to the 100-year storm, flooding will be no worse than it is today.

Because we find the Project, as conditioned, will effectively treat contaminants in the stormwater and will adequately address stormwater runoff and flooding concerns associated with the increase in impervious surface, we answer Appellants' Question 12 by concluding that the Project will not cause undue water pollution under Criterion 1.

    ii.    Criterion 1(B) (Question 13)

Under Criterion 1(B), an applicant must demonstrate that the project "will meet any applicable health and environmental conservation department regulations regarding the disposal of wastes, and will not involve the injection of waste materials or any harmful or toxic substances into ground water or wells." 10 V.S.A. § 6086(a)(1)(B).[17]

The Project does not involve the handling of harmful chemicals. Any impact to adjacent waterways or contributions to water pollution will stem from the increased stormwater runoff caused by the addition of impervious surfaces to Lot 15, and any contaminants in that runoff will largely be attributable to petroleum and other residues that leak from vehicles onto Hannaford's parking area.[18] Our discussion under Criterion 1 more fully explains Applicant's treatment measures, but for the purposes of our discussion here, we find that Applicant's dual treatment measures, the ADS HDPE system and the grass swale, will adequately address contaminants and wastes in the stormwater runoff.

---

[16] Applicant will also make improvements to the detention pond between Lots 2 and 3.

[17] Appellants' Question 13 asks, "Will the project cause violation of health department and department of environmental conservation regulations, or involve injection of harmful or toxic substances into ground water under criterion 1B?" Appellants' Statement of Questions (SOQ) at 4, filed Aug. 25, 2014.

[18] We generally do not consider stormwater under Criterion 1(B). See In re Rivers Dev. Conditional Use Appeal, Nos. 7-1-05 and 68-3-07 Vtec, slip op. at 16 (Vt. Super. Ct. Envtl. Div. March 25, 2010) (Durkin, J.).

We therefore answer Appellants' Question 13 by concluding that the Project complies with Criterion 1(B).

### iii. Criterion 1(E) (Question 14 and 15)

Criterion 1(E) requires the applicant demonstrate that the project, "will, whenever feasible, maintain the natural condition of [adjacent] stream[s], and will not endanger the health, safety, or welfare of the public or of adjoining landowners." 10 V.S.A. § 6086(a)(1)(E).

Appellants contend that the Project will alter the natural condition of Patrick Brook (Question 14)[19] and will exacerbate flooding and create unsafe conditions thereby endangering the health and safety of the public and adjoining landowners (Question 15).[20] Through their testimony, we understand Appellants to raise three issues. First, Appellants contend that the additional stormwater runoff from the Project will increase peak flows in Patrick Brook and exceed the capacity of the already undersized culvert under Route 116 resulting in downstream flooding. Next, Appellants argue that during 50 and 100-year storm events, the volume of water will exceed the capacity of Applicant's system and cause flooding on the adjacent Dark Star lot (Lot 11). Lastly, Appellants claim that the grass swale on Lot 15 will pose a health risk in that it will provide a breeding ground for insects and pests. We address these concerns in turn.

Because the Project will result in less than 10 acres of impervious surface, ANR does not require Applicant to meet the Extreme Flood Protection Standard under ANR's stormwater regulations.[21] Instead, Applicant need only demonstrate that the Project's peak discharge rate during the 1 and 10-year storm will be no greater than it was pre-development,[22] and that during a 100-year storm (5.2 inches of rain in any 24-hour period) the Project will not exacerbate flood conditions on nearby properties in Commerce Park beyond pre-development conditions. Applicant has demonstrated compliance with these requirements. Up to the 10-year storm (3.2 inches of rain in any 24-hour period), Lot 15's peak flow into Patrick Brook will not increase post-development. Further, the Project will not exacerbate the flood conditions

---

[19] Question 14 asks, "Will the project maintain the natural condition of Patrick Brook, the Cheese Factory , the La Platte River and the Cheese Factory Canal (Sic), under criterion 1(E)?" Appellants' SOQ at 4.

[20] Question 15 asks, "Will the project endanger the health, safety or welfare of the public or of landowners adjoining Patrick Brook, the Cheese Factory Canal, and the La Platte River, under criterion 1(E)?" Id. at 5.

[21] See VSMM § 1.1.5.

[22] Applicant's stormwater system complies with the Channel Protection Treatment Standard, VSMM § 1.1.2, and the Overbank Flood Protection Standard, VSMM § 1.1.4. These standards limit the volume of water that may be released into Patrick Brook during the one and ten year rain events.

that currently exist on adjacent properties during major storms. Appellants' evidence does not challenge the Project's compliance with ANR's regulations. Instead, Appellants focus on the infrequent but severe 100-year storm. Appellants argue that the Project will increase the total volume and peak flow in Patrick Brook during the 100-year storm, altering the brook's natural condition and exceeding the capacity of the Patrick Brook Culvert, which will cause flooding and pose a danger to public health and safety. Therefore, they argue, despite the fact that ANR does not require Applicant to meet the Extreme Flood Protection Standard, the Project's impacts to Patrick Brook and down-stream infrastructure run afoul of Criterion 1(E).[23]

We find Appellants' claims unpersuasive. The Project will have little discernable impact to the natural condition of Patrick Brook, and we find that any minor contribution to the peak flow or total volume of Patrick Brook will not pose a danger to the public's health or safety. There was no evidence that the Project will result in any alteration or eroding to the brook's banks, degrade its water quality, destroy habitat, or alter the characteristics the brook, thus we conclude the natural condition the stream will be maintained. Appellants appear to focus on the potential increased risk of flooding they claim will be caused by the Project during a 100-year storm. We acknowledge that the culvert under Route 116 has been identified as undersized to accommodate storm flows associated with the 100-year storm. The issue is whether the Project will have a material impact to these flooding concerns and whether such impacts are grounds to deny the Project under Criterion 1(E).

Hannaford and Appellants dispute the most accurate prediction of the increase, over pre-development levels, of stormwater from the Project that will be discharged to Patrick Brook during a 100-year storm. Much of the focus was on HydroCAD modeling provided by Hannaford and the identification of errors in that modeling by Appellants' expert, Mr. Torizzo. In pre-filed testimony and at trial, Mr. Torizzo discussed at length the modeling errors he identified in in Applicant's stormwater impact assessment, claiming that Applicant's models inappropriately relied on a sequential routing method instead of a dynamic approach and thereby failed to correctly assess the capacity of the system or to accurately represent the likely

---

[23] Appellants do not specify that this claim is limited to Criterion 1(E), but it appears to most neatly fit within the scope of this Criterion. Our decision would remain the same were we to analyze these arguments under other Act 250 criteria.

flooding and rate of discharge associated with the stormwater system during a major storm.[24] Mr. Torizzo went on, discussing that when he switched the model to a dynamic method the number of errors produced by the model increased and could only be eliminated by bypassing the storage chambers. This result, he explained, was because during a 100-year storm there is so much water coming into the system that the chambers fill up and become essentially ineffective. Without additional storage, the only way to get an accurate prediction out of the models is to bypass the storage chambers in the more extreme rain events. When he altered the model to bypass the chambers, the model predicted an increase in the peak discharge rate from the Project during the 100-year storm of 16.77 cfs, 2.77 cfs over Applicant's assessment. Appellants assert that Mr. Torizzo's calculation more reliably demonstrates the actual increase in peak discharge that will result from the Project, and at such a discharge rate the Project could have consequences for downstream infrastructure.

Accepting that there may be some discrepancy in Applicant's HydroCad models, we conclude that Applicant has adequately demonstrated that the Project will not endanger the public health or safety. First, the alleged errors occurred in computer generated models. As Hannaford's expert testified, there is a significant degree of inaccuracy with any stormwater model and they cannot be relied upon to precisely predict the volume of water that will be released by any individual project during a 100-year storm event. Even Mr. Torizzo admitted to submitting models with errors and that the presence of errors does not render the information critically flawed. Moreover, the difference between the peak discharge predicted by Applicant with the alleged errors and Mr. Torizzo's corrected model is minor—2-3 cfs, less than one percent of the total peak volume in Patrick Brook during a 100-year storm.[25]

Ultimately, what the evidence does reveal is that, post-development, the peak discharge to Patrick Brook by the Project during a 100-year storm—about 16.77cfs using Appellants' more conservative estimate—represents only about four percent of the peak flow of the brook. More importantly, the Project's peak discharge into Patrick Brook will precede the peak flow of the brook by about 40 minutes. Thus the increase in peak discharge to the brook as a result of

---

[24] According to Mr. Torizzo, the dynamic modeling method better accounts for a closed pipe and chamber type system like that proposed by Applicant and a sequential routing method is more typically used for systems designed with open channels.

[25] Under Applicant's initial models, it predicted an increase of 4 cfs over pre-development levels, about 1% of the total stream peak flow. Applicant's corrected models predict an increase of 14 cfs. Appellants argue it is closer to 16.7cfs. Under either, we conclude the Project will not pose a danger to public health or safety.

the Project will not increase the peak flow of the brook. Therefore, because of the Project's relatively minor increase in peak discharge compared to the total peak flow of the brook, and because the Peak flow of the Brook will not increase, we conclude that any contribution to downstream flooding from the Project will be minor and will not endanger the public health, safety, or welfare under Criterion 1(E).

Appellants also raise a concern about flooding on the Dark Star property (lot 11). Much of the focus of Appellants' testimony and argument again focuses on the alleged errors in Applicant's HydroCad model during the 100-year storm event. Appellants assert that Applicant's model is flawed and fails to adequately predict the flooding that will occur during the 100-year storm event.[26] A more accurate scenario, Appellants claim, is that during a 100-year storm the volume of water will quickly exceed the capacity of the system and the excess water will flow onto lot 11.[27]

With Applicant's stormwater system, during most rainstorms, the drainage and flooding on the Dark Star lot will improve post-development. For major events, such as a 100-year storm, flood conditions will be no worse than currently exist. At trial Mr. Torizzo agreed that even with the alleged modeling errors, the evidence demonstrated that the Project would not increase flooding on the adjacent Dark Star property beyond what currently occurs during major (50 and 100-year) rain events. We therefore find the Project will not endanger the health, safety, or welfare of Dark Star or other adjoining landowners.

Lastly, Appellants claim that stagnant water will be nearly always present in the grass swale on Lot 15, providing a breeding ground for mosquitoes and a danger to children. A similar claim was discussed under Criterion 1(B) and we refer readers to our discussion there. To summarize, Applicant proposes to construct a grass treatment swale according to ANR's standards. As proposed, the swale will not have standing water and will pose no risk to human health. If, post-development, the grass swale does not function properly, Applicant will be obligated to remedy the issue.

In conclusion, because the Project will not endanger nearby properties; will, to the extent feasible, maintain the natural condition of Patrick Brook; and will not endanger the

---

[26] We note that many of the errors identified were classified at a level of 1, the least significant.

[27] Appellants also claim that Applicant's stormwater system relies on Lot 11 for stormwater storage, and because the owner of Lot 11 does not consent to the use of the lot, this represents a taking. Because we find that the Project will improve conditions on Lot 11 during most rain events and will not create or exacerbate conditions as they currently exist in large storms, such as the 50- and 100-year, we find Appellants' claim is without merit.

health, safety, or welfare of the public, we answer Appellants' Questions 14 and 15 by concluding that the Project complies with Criterion 1(E).[28]

iv.    Criterion 4 (Question 16)

Criterion 4 requires that the Project not cause "unreasonable soil erosion or reduction in the capacity of the land to hold water so that a dangerous or unhealthy condition may result." 10 V.S.A. § 6086(a)(4). Appellants' primary contention regarding Criterion 4 is that by replacing the Class III Wetland with 2.69 acres of impervious surface, the capacity of the area to hold water will be significantly decreased and the Project does not afford adequate opportunity for groundwater recharge.

It is true that total volume of water discharged into Patrick Brook will increase as a result of the development.  A Class III wetland will retain and hold more water than a large parking lot.[29]  Yet, the Project design incorporates measures to store water and release the stored capacity overtime to reduce impacts.  The Project also uses a grass swale and other vegetative buffers that will allow the natural recharge of ground water.  Any reduction in the land's capacity to hold water is, therefore, not unreasonable and will not result in a dangerous or unhealthy condition.

Although raised through Appellants' Question 16,[30] there was little argument concerning erosion.  During the construction phase, erosion may require greater attention as disturbed soils can more easily wash away.  Applicant has, however, proposed a series of temporary erosion control measures that comply with best practices, and has received a Construction General Permit from ANR approving of the erosion controls that will be employed during construction.  During normal operation, Applicant will employ permanent erosion control techniques such as vegetation covers and impervious surfaces and Applicant's stormwater system regulates the rate of discharge of stormwater thus reducing erosion

---

[28] There was no evidence of impacts to the canal or LaPlatte River under Criterion 1(E) and thus we do not address impacts to those waterbodies.

[29] A more in depth discussion of the characteristics of the wetland and its functions can be found in the Wetlands Appeal decision, Docket No. 73-5-14 Vtec.

[30] Question 16 asks, "Will the Project cause unreasonable soil erosion or reduction in the capacity of the Land to hold water so that a dangerous or unhealthy condition may result under Criterion 4?" Appellants' SOQ at 5.

impacts from runoff.[31] We therefore conclude that the Project will not cause unreasonable soil erosion.

Because we find the Project will not cause unreasonable erosion or reduction in the capacity of the land to hold water, we answer Appellants' Question 16 by concluding that the Project complies with Criterion 4.

In addition to the questions addressed above, we also answer Appellants' Questions 17,[32] 18,[33] 19[34] and 20[35] by concluding that the Project's stormwater containment and treatment measures ensure that the Project complies with Criterion 1, 1(B), 1(E), and 4. Additionally, we also deny Section 4 of Appellant's Motion for Entry of Judgment as we conclude there is ample evidence for this Court to make positive findings under Criterion 1, 1(B) and 4. The Project's stormwater system adequately treats and manages stormwater runoff, and therefore the Project will not measurably increase any risk of flooding, will not cause

---

[31] In response to the Court's question about erosion concerns, Applicant's expert testified that erosion was not an issue because the culvert under Commerce Street will remain at the same slope. We understand this response to specifically address concerns about water that collects in the swale between Lots 10 and 11 and then drains to the detention pond north of Commerce Street.

[32] Question 17 asks, "Will the Project cause increased quantities of stormwater runoff, including sediments and contaminants from a large supermarket parking lot, to be discharged onto the lands of the applicant and the lands of Dark Star Properties, into Patrick Brook and LaPlatte, onto lands of the Guttler farm, and into stagnant swales and underground storage chambers adjacent to areas of frequent human use, causing risk of flooding, inundation by waste, harm to natural condition of Patrick Brook, the LaPlatte River and the Cheese Factory Canal, and human exposure to pathogen and mosquitoes, and thereby cause undue water pollution, alteration of the natural condition of streams, and dangerous, unhealthy conditions under Criteria 1, 1(B), 1(E) and 4?" Appellants' SOQ at 5.

[33] We interpret Appellants' Question 18 to ask whether the Project will cause the issues discussed in Question 17 and is it because Applicant failed to consider and to design an alternative that would reduce the impervious surface by reducing the footprint of the project. Because we find the Project complies with the applicable stormwater and water quality criteria, we answer this question in Applicant's favor. We also note that Applicant was under no obligation to consider a smaller building and parking lot so long as the Project complies with all relevant criteria and regulations.

[34] Question 19 asks, "Will the Project cause increased quantities of stormwater runoff, including sediments and contaminants from a large supermarket parking lot, and including sediments eroded by high volumes of water passing through the wetland adjacent to Patrick Brook during peak storm events, to be discharged in Patrick Brook and the LaPlatte River and onto the lands of the Guttler farm, thereby causing undue water pollution, harm to the natural condition of Patrick Brook and the LaPlatte River, and endangerment of the health, safety or welfare of the public under criteria 1 1(B), 1(E) and 4?" Appellants' SOQ at 5.

[35] Question 20 asks, "Will the project cause quantities of stormwater runoff, including sediments and contaminants from a large supermarket parking lot, and including sediments eroded by high volumes of water passing through the wetland adjacent to Patrick Brook during peak storm events, to be discharged into Patrick Brook and the LaPlatte River and onto the lands of the Guttler farm, thereby causing undue water pollution, harm to the natural condition of Patrick Brook and the LaPlatte River, and endangerment of the health, safety or welfare of the public under criteria 1 1(B), 1(E) and 4, because Hannaford has failed to consider and failed to utilize design alternatives that would reduce the impervious area by reducing the footprint of the store, or the size of the parking lot, or both?" Appellants' SOQ at 6.

39

wastes or pollution to enter onto adjacent lands or nearby streams, and will not pose a danger to human health or public safety.

b.      Criterion 5

Act 250 Criterion 5 requires that a development "not cause unreasonable congestion or unsafe conditions with respect to use of the highways, waterways, railways, airports and airways, and other means of transportation existing or proposed." 10 V.S.A. § 6086(a)(5).  In reviewing a project under Criterion 5, we also consider whether the project may exacerbate already congested or unsafe traffic conditions.  In re Pilgrim Partnership, 153 Vt. 594, 596–97 (1990).  We cannot, however, deny a permit because a project creates unreasonable congestion or unsafe conditions within the meaning of Criterion 5, "but permit conditions can be imposed to remedy those conditions." In re Agency of Transp., 157 Vt. 203, 207 (1991) (citing 10 V.S.A. § 6087(b)).  An opponent to a proposed development carries the burden of persuasion under Criterion 5 to show that the proposed development will cause "an unreasonable or adverse effect." 10 V.S.A. § 6088(b).  Nevertheless, the applicant must produce sufficient evidence for the Court to make positive findings.  Id.; see also In re Route 103 Quarry, No. 205-10-05 Vtec, slip op. at 8 (Vt. Envtl. Ct. Nov. 22, 2006) (Durkin, J.) (stating that section 6088(b) pertains only to the burden of persuasion and that the "applicant always carries the initial burden of production").

Initially, we address a challenge by Appellants to the procedure and sequence of Applicant's permitting process.  Appellants claim that Applicant's proposed traffic mitigation violates Act 250 in that it segments review of mitigation measures, such as highway widening and the replacement of Town culverts, when those measures are necessary and will impose impacts under Act 250 (Question 6 and 7).[36]  As we discussed in the stormwater context in our denial of Appellants' motion for entry of judgment because a necessary co-applicant was lacking, see Hinesburg Hannaford CU Approval, Nos. 129-9-12, 163-11-12, 68-5-14, 69-5-14, 70-5-14, 73-5-14, and 113-8-14 Vtec, slip op. at 3 (Vt. Super. Ct. Envtl. Div. Oct. 27, 2015) (Walsh, J.), there is no requirement under Act 250 that all necessary permits for proposed mitigation measures be reviewed and in place at the time an Act 250 permit is sought.  We therefore

---

[36] Appellants' Question 7 asks, "Does Act 250 require that traffic mitigation measures such as these that may be necessary or that are reasonably likely to be necessary and that, if constructed, would cause potentially severe impacts to Patrick Brook and the community be examined in this case not in a subsequent proceeding?" Appellants' SOQ at 3.

answer Appellants' Question 6 by concluding that the fact that mitigation measures may require additional permits or review from the Town does not impede our review under Act 250.

In order to determine whether the Project satisfies Criterion 5, we must first consider whether the Project will cause unreasonable congestion or unsafe conditions on the roadways, including whether the Project may exacerbate already congested or unsafe traffic conditions (Appellants' Question 23). Next, if we determine that the Project will create or exacerbate unreasonable congestion or unsafe conditions, we must determine what mitigation measures are necessary to adequately address the congestion and safety impacts of the Project (Appellants' Question 24). This analysis is undertaken recognizing that our implementation of Act 250 is a continual balance between competing interests. See In re Village Assocs., 2010 VT 42A, ¶ 17, 188 Vt. 113 (noting that the "goals of Act 250 have always been balanced against the economic necessity of development . . . [resulting in] a practical approach to regulation").

In Vermont, traffic congestion is classified using a Level of Service (LOS) rating of A to F (F being the worst). Generally, it is the Vermont Agency of Transportation's (VTrans) policy to maintain roadways and signalized intersections at a LOS C or above. For unsignalized intersections, LOS D is acceptable. In addition to congestion, VTrans maintains records of traffic accidents, and will identify areas prone to accidents as high crash locations (HCLs).

The parties disagree about the predicted traffic impacts of the Project and the necessary mitigation measures. Relying on national data from the Institute of Traffic Engineers (ITE), and state and local supermarket trip generation data compiled by VTrans, Applicant predicts that the Project will generate 386 end trips per hour at the weekday peak p.m. hour.[37] Appellants' expert, using trip data for the local Lantman's grocery store, calculated the trips per square foot generated by the store and applied that formula to the proposed 36,000-square-foot Hannaford, concluding that the Project will generate closer to 480 peak p.m. hour trips.

Appellants raise several challenges to Applicant's traffic values. First, they claim that Applicant has failed to satisfy its burden of production under Criterion 5 and the burdens of production and persuasion under Criterion 9(K) because Applicant based its traffic projections on customer usage that was lower than the values relied upon for designing the size and location of the Hannaford (Question 21). While Appellants appear to assert that the customer numbers Applicant used for its decision to build a 36,000-square-foot store are higher than the

---

[37] This represents the weekday evening commute hour between 4:30 p.m. and 5:30 p.m.

trip generation numbers used for its traffic analysis, we have no evidence of the factors Applicant relied on to determine that 36,000 square feet was appropriate for the Hinesburg Hannaford. Moreover, our traffic analysis under Criterion 5 and 9(K) does not encompass an analysis of an applicant's business decisions. We therefore answer Appellants' Question 21 by concluding that Applicant, through the testimony and exhibits of its expert, Mr. Dickinson, produced sufficient reliable evidence to meet Applicant's burden of production.

Appellants next argue that Applicant's traffic analysis methods are not reasonable or reliable because Applicant did not consider existing local trip generation for comparable businesses within Hinesburg (Question 22). Mr. Dickinson relied on data from ITE and VTrans's Chittenden County supermarket trip generation rates to develop his prediction of 386 p.m. trips. Appellants contend that a more accurate number is closer to 480 peak p.m. trips and argue that Mr. Dickinson's calculations are flawed because he did not consider local trip generation figures for Lantman's.

We do not find that Mr. Dickinson's exclusion of the Lantman's traffic data renders his assessment inaccurate. Mr. Dickinson repeatedly made conservative assumptions and relied on data commonly used in the industry. In assessing the impacts to local traffic problems, Mr. Dickinson used the more conservative value (larger number of trips) from the 2008 ITE supermarket trip generation rate compared to VTrans's predictions. Additionally, VTrans predicts that Route 116 will experience zero background growth, but Mr. Dickinson assumes a 3% growth rate to reach his no-build background traffic volume predictions despite recent traffic counts showing that the traffic count has remained nearly flat since 2008. Further, despite the agreement that Lantman's will close upon Hannaford's opening and cannot be used as a grocery store, Mr. Dickinson assumes the current number of trips generated by Lantman's will continue indefinitely. Thus, while Appellants suggest a higher value should be used for the peak p.m. trips generated by the Project, we find Mr. Dickinson's assessment provides a credible prediction of likely traffic conditions after the Project is completed.[38]

Even without added trips from the Project, several areas in Hinesburg near and along Route 116 currently see significant traffic congestion and delays and several HCLs have been

---

[38] Furthermore, adopting the numbers proposed by Appellants would not change our analysis. The intersections that were found to be a failing LOS with the 380 trips are also failing with the larger number, and there are no intersections that had an acceptable LOS at the 380 trip mark but that failed when the added trips were included.

identified within the Project impact area.[39]  As one approaches Hinesburg from the north, the Route 116/CVU Road intersection has been identified by VTrans to be a HCL.  Moving south, Route 116 has three HCLs that extend just north of the Commerce Street intersection south to the where Charlotte Road intersects with Route 116.  Although congestion at the Commerce Street intersection is not as poor as the two intersections to the south, it currently has a marginal LOS.

The Commerce Street westbound right-turn and through lanes have an LOS D in the no-build scenario, and with the Project will degrade to an LOS E. [40]  The Route 116 southbound left-turn lane is LOS D in the no-build and is predicted to remain at this level after construction.  The un-signalized Route 116/Mechanicsville Road intersection currently experiences significant delays and congestion, and even without the Project the Mechanicsville Road westbound lane is LOS F.  The Route 116/Charlotte Road intersection, south of Mechanicsville Road, is LOS F in the no-build scenario. Southbound traffic currently backs up at this intersection beyond Commerce Street.  At the edge of the area considered for traffic impacts, the Silver Street intersection currently has a predicted LOS D in the no-build scenario, which will likely remain at this level with the Project.

With many of these intersections already experiencing congestion and safety concerns without the Project, the addition of 386 peak hour trips in the early evening will certainly exacerbate existing conditions.  As we cannot deny a project under Criterion 5 based on traffic impacts, mitigation is necessary.[41]

Applicant proposes several mitigation measures with a focus on the Route 116 Commerce Street intersection, where the traffic impacts from the Project will be most prominent.  While not entirely sufficient, we find the mitigation measures proposed by

[39] Mr. Dickinson considered an area extending from the CVU/Shelburne Road intersection to the north to Silver Street to the south.

[40] Mr. Dickinson's TIA report was issued in 2013 and was largely compiled over 2010–2012. He used 2008 traffic counts (which were larger than counts performed in 2012) and predicted a 3% background growth rate through 2019 to arrive at his background traffic volume in the no-build scenario.  We find his predictions, although more conservative than current conditions, provide an accurate representation of traffic congestion and turning patterns in Hinesburg.   A more recent traffic analysis performed for the Chittenden County Regional Planning Commission (CCRPC) confirmed the 2019 projected traffic volumes Mr. Dickinson used in his traffic analysis. See Applicant's Ex. 80.

[41] Appellants' Question 23 asks whether mitigation is necessary. We answer this question by concluding that some mitigation is needed.

Applicant to be necessary for our Act 250 approval. These measures, outlined in more detail in Mr. Dickinson's Traffic Impact Study, see Applicant's Ex. 29 and 29a, include:

1) Increasing the length of the southbound Route 116 left-turn lane at Commerce Street from 75 feet to 185 feet.

2) To accommodate the Route 116 left-turn lane, the taper distance shall be 100 feet from the turn lane with an 85 foot centerline offset in advance of the taper.

3) Extending the westbound right-turn lane on Commerce Street from 80 feet to 270 feet.

4) The westbound left-turn/through lane stop bar on Commerce Street will be moved back 25 feet to accommodate left-turning southbound traffic.

5) Relocating the curb cut for the Firehouse Plaza farther east on Commerce Street away from the Route 116 intersection.

6) Concurrent signal phasing for eastbound/westbound traffic at the Route 116/Charlotte Road intersection and increasing the north/south green signal time. Accompanying this signal adjustment, Applicant will relocate the stop bar and sidewalk at the Lantman's entrance.

7) Installing sidewalk along south side of Commerce Street to connect the existing sidewalk to Route 116, as well as installing sidewalks within the Project area to allow pedestrian access from Mechanicsville Road and Commerce Street.

Applicant also offers $25,000 for a signal at the Mechanicsville Road intersection, but argues that it should not be required to pay for the entire traffic light because the congestion issues are present without the Project, and the increased traffic attributable to the Project will only be a small portion of the overall traffic at the intersection.

Recent Vermont legislation empowers an Act 250 District Commission or the Agency of Transportation (and therefore this Court when considering an appeal) to assess a transportation impact fee to fund capital improvements necessary to mitigate transportation impacts of proposed developments. See 10 V.S.A. §§ 6101–6111. The Statute contemplates implementation through rules to be adopted by the Natural Resources Board (NRB) or the

Agency of Transportation. See 10 V.S.A. § 6111. We are not aware of the rules having been adopted, and at trial, the parties did not specifically address this legislation.

Our implementation of Act 250 is a continual balance between competing interests. See In re Village Associates, 2010 VT 42A, ¶ 17, 188 Vt. 113 (noting that the "goals of Act 250 have always been balanced against the economic necessity of development . . . [resulting in] a practical approach to regulation."). In this matter, we must balance a development proposal and its associated additional traffic with an already existing traffic problem. While we agree that the Project is not the sole cause of traffic issues at the Mechanicsville Road intersection, we find that based on the current LOS, a traffic signal is necessary before the Project is operational to prevent further degradation of unacceptable traffic conditions. We also conclude that this new traffic signal and the existing signals at the Commerce Street/Route 116 and Charlotte Road/Route 116 intersections should be coordinated to further improve traffic conditions.

As we have no direction from the NRB or Agency of Transportation on the appropriate implementation of 10 V.S.A. §§ 6101–6111, we leave it to the parties to work through the financing details for the required actuated traffic signal to be installed at the Route 116 and Mechanicsville Road intersection. To be clear, our approval requires that a traffic signal is installed before the Project is completed. Applicant, however, need only pay its proportional share of this mitigation measure.

To address truck traffic, the District Commission sought to restrict deliveries by trucks WB-62 and larger to off peak hours and prohibit trucks larger than WB-62 from making deliveries between 6:00 a.m. and 6:00 p.m. Applicant appears to have initially challenged the necessity of limiting truck traffic (Applicant's Question 2), but Mr. Dickinson's final traffic report adopts the view that some truck traffic limitations are appropriate. See Applicant's Ex. 29. While we do not adopt the District Commission's position wholesale, we find that trucks shall be limited according to the recommendations in Mr. Dickinson's report. Therefore, trucks WB-62 size or larger making deliveries to the site shall be limited in the following ways: trucks traveling south along Route 116 shall not make deliveries to the Hannaford between the a.m.

and p.m. peak hours (7:00–9:00 a.m. and 3:30–6:00 p.m.); trucks traveling north along Route 116 shall at all times enter the site via Mechanicsville Road.[42]

We are also directed under Criterion 5 to assess whether the Project will cause or exacerbate unsafe conditions for drivers and pedestrians.  Route 116 does have several HCLs, and the increased volume of traffic is a concern for both pedestrian and vehicular safety.  But due to proposed changes to Route 116 and Applicant's mitigation measures, we conclude that the Project satisfies the safety concerns contained in Criterion 5.

For one, several changes have occurred to Route 116 that will improve vehicular and pedestrian safety along Route 116.  One of the identified HCLs, the Route 116 Shelburne Falls/CVU Road intersection, is currently designated as a VTrans safety improvement project, which will include designated left-turn lanes, an exclusive right-turn lane on Shelburne Falls Road, and new signalization equipment.  Additionally, since much of the traffic data was compiled, the speed limit on Route 116 just south of Patrick Brook was reduced from 40 to 30 mph; thus cars will be approaching the Commerce Street intersection at slower speeds, improving both pedestrian and vehicular safety.  Furthermore, the recent incorporation of exclusive pedestrian signal phasing (all traffic stops while pedestrians cross) at the Commerce Street and Charlotte Road intersections allows pedestrians to cross Route 116 in relative safety even at peak hours.

The required mitigation measures will also improve accessibility and safety and reduce congestion.  Installing a signal at the Mechanicsville/Route 116 intersection and coordinating it with the signals to the north and south will achieve a smoother and more consistent flow of traffic.  Both Appellants' and Applicant's experts agreed that coordinating the traffic lights will improve congestion and reduce the need and opportunity for risky behavior often accompanying long delays and frustrated drivers.  The additional sidewalks that Applicant will install will provide pedestrians a designated walking path from Mechanicsville Road through to Commerce Street and from there to Route 116, thus improving both pedestrian safety and accessibility of the Hannaford.  Lastly, the limitation on truck traffic at the Commerce Street intersection will mitigate the risk of turning trucks encroaching on pedestrians using the

---

[42] To the extent Applicant's still challenge whether limitations on truck delivery times are needed through Question 2, we answer the question by imposing this condition.

46

Commerce Street sidewalk, and also relieve some of the traffic at the Commerce Street intersection.

Accepting that all of the proposed mitigation measures are necessary, Appellants nevertheless argue that the mitigation is insufficient to adequately address the traffic and safety impacts of the Project. First, Appellants argue that Applicant should be responsible for funding a traffic study of the Silver Street intersection to determine what measures are necessary to address the congestion and delays experienced, especially for traffic turning left out of Silver Street. We disagree. The intersection has a LOS D without the Project, at the bottom range of acceptable unsignalized intersections. With the Project, some models predict the east bound turn lane will degrade to an LOS E. The Silver Street intersection, however, is expected to bear only a 7% increase in traffic attributable to the Project, and the average queue length during the peak p.m. hour is estimated at only seven vehicles. Ultimately, the actual impacts attributable to the Project are imprecise due to the intersection's distance from the Project and few Project trips that will turn onto Route 116 from Silver Street. As Appellants' traffic expert Mr. Bruno agreed, the Silver Street intersection is on the edge of quantifiable Project impacts. We therefore conclude that the LOS E predicted by some of the modeling does not establish that the Project will cause or exacerbate unreasonable congestion and delays at the intersection.

As Mr. Dickinson described in his direct testimony, the models fail to account for gaps created at the Charlotte Road traffic signal that allow left-turning traffic to safely enter Route 116. When observed conditions are incorporated, Mr. Dickinson found that the delays and congestion at the Silver Street intersection are not materially increased post-development, and the intersection will likely remain and LOS D.[43]

We find Mr. Dickinson's assessment credible and an accurate assessment of the traffic impacts at Silver Street that are attributable to the Project. The intersection is on the edge of quantifiable impacts and is expected to see a relatively small traffic increase attributable to the Project. We therefore conclude that the Project will not cause unreasonable congestion at the unsignalized Silver Street intersection, and therefore, Applicant is not required to conduct any mitigation at Silver Street.

---

[43] We note that in Mr. Dickinson's TIA he did initially conclude that the Silver Street east bound left and right turn lane did degrade to an LOS E post-development. As he explained in his direct testimony, however, this initial assessment was based on models that did not accurately represent actual observed conditions.

Appellants also suggest that in order for the southbound left-turn lane at the Route 116 Commerce Street intersection to adequately accommodate traffic it must be extended to 200 feet, thus requiring expansion of Route 116 and replacement of the Patrick Brook Culvert. Based on the evidence presented, however, we find that the 185 foot left-turn lane is adequate, and no widening of Route 116 beyond what Applicant has proposed is necessary. Because much of the evidence before the Court is based upon predictive traffic models, there is no certainty that the proposed 185-foot left-turn lane will be sufficient. We therefore also impose the condition that, post-construction, Applicant and the Town shall monitor traffic conditions relating to this left-turn lane to determine if additional mitigation measures are necessary. If additional mitigation is necessary, Applicant shall be required to seek a further amendment to this Act 250 approval for the additional mitigation.

Lastly, Appellants argue that the proposed mitigation measures are inappropriate because the conditions will only partially mitigate the increased traffic and the increased risk of car accidents caused by the Project, the conditions will decrease pedestrian convenience and jeopardize pedestrian safety, and the proposed conditions are designed to satisfy state and national standards rather than the needs and policies of the Town (Question 25).[44] As discussed above, we find that the proposed mitigation measures coupled with our imposed conditions adequately ensure that the Project will not result in or exacerbate unreasonable traffic congestion or unsafe conditions within the area impacted by the Project.

In summary, based on the evidence of increased traffic that will result from the Project and its impacts on safety and congestion along Route 116 in Hinesburg, Applicant's proposed mitigation measures are necessary. We also impose the additional mitigation measures discussed above. As conditioned, we conclude that the Project complies with Criterion 5.

c.      Criterion 9(K)

Where an applicant proposes to develop adjacent to public services, lands, or facilities, Criterion 9(K) requires the applicant to demonstrate that the development "will not unnecessarily or unreasonably endanger the public or quasi-public investment in the facility, service, or lands, or materially jeopardize or interfere with the function, efficiency, or safety of,

---

[44] Appellants' Question 25 fails to consider the appropriate standard for analysis under Criterion 5. Instead of elimination, an applicant need only mitigate impacts so that congestion and traffic safety satisfy Criterion 5—i.e., so that they are not unreasonable. See 10 V.S.A. § 6086(a)(5).

or the public's use or enjoyment of or access to the facility, service, or lands." 10 V.S.A. § 6086(a)(9)(K).

Appellants' Questions 28, 29, 30, and 31 challenge the Project's impacts under Criterion 9(K), arguing that the Project will unnecessarily or unreasonably endanger the public investment in the canal and associated pedestrian paths, as well as other public infrastructure.[45] Appellants also suggest that the Project will materially jeopardize or interfere with the function, safety, and the public's use or enjoyment of the public facilities.[46] We address these questions in order, and for the following reasons conclude that the Project complies with Criterion 9(K).

Appellants' Question 28 asks whether the Project will unnecessarily or unreasonably endanger the public investment in the canal path and footbridge. Appellants argue that significant public investment was made in the canal path with the goal of providing an enjoyable setting to walk and recreate, and the Project, by altering the backdrop and setting for users of the path, will result in a decrease in pedestrian use of the path and thus interfere with the public investment. We find this argument fails to establish a violation of Criterion 9(K).

Criterion 9(K) is primarily concerned with protecting "state and local governments from adverse fiscal impacts on public facilities and investments that are adjacent to the proposed project." In re Barefoot & Zweig Act 250 Application, No. 46-4-12 Vtec, slip op. at 10 (Vt. Super. Ct. Envtl. Div. Mar. 13, 2013) (Durkin, J.) (quoting In re St. Albans Grp. & Wal-Mart Stores, Inc., No. 6F0471-EB, Mem. of Decision, at 9 (Vt. Envtl. Bd. Apr. 15, 1994)). Although Appellants highlight the significant public investment the canal path received through the Town's Streetscape Project,[47] the Project will in no way increase the cost of maintaining the path, interfere with public access to the path, or threaten the integrity of the path and footbridge in anyway. We are unaware of any case law where a court held that the visual appearance of a project, without any adverse fiscal impacts, resulted in interference with the public's investment under Criterion 9(K). Further, the context of the situation suggests any interference

---

[45] Appellants Questions 28 and 30 ask whether the Project will unnecessarily or unreasonably endanger the public investment in the canal walk, and the public investment in other governmental and public facilities.

[46] Questions 29 and 31 ask whether the Project will materially jeopardize or interfere with the function, efficiency or safety of the various public investments, and whether the Project will materially jeopardize or interfere with the public's use or enjoyment of access to the various public facilities.

[47] A project where the Town received over $100,000 from federal and state authorities to improve sidewalk infrastructure and to construct the walkway along the canal as well as install the Pony Truss Bridge over the canal.

is not unreasonable. The canal path is not on Town land. Instead, the Town has an easement for the path over the southeastern portion of Lot 15 that was granted well after Lot 15 was slated for commercial development. We therefore answer Appellants' Question 28 by concluding that the Project will not unnecessarily or unreasonably endanger or interfere with the public investment in the canal path.

Appellants also challenge the Project's impacts on the canal path under the second prong of Criterion 9(K) (Question 29), claiming that the project will materially jeopardize or interfere with the public's use or enjoyment of the canal path and footbridge. Appellants, citing In re Robert and Deborah McShinsky, No. 3W0530-EB, Mem. of Decision, at 10 (Vt. Envtl. Bd. April 21, 1988), aff'd, 153 Vt. 586 (1990), argue that the size and proximity of the Project to the path will significantly interfere with the public's enjoyment because users of the path currently enjoy a view of an undeveloped field, but after construction will be confronted with the expansive and imposing side of the store and parking lot. Understanding that the canal path may be less scenic with the Project, we find Appellants' argument fails to establish grounds to deny the Project under 9(K).

There is little case law squarely addressing Criterion 9(K)'s requirement that a project not materially jeopardize or interfere with the public's use and enjoyment of public lands and facilities. Several decisions of the former Environmental Board from the late 1980s and early 1990s do appear to recognize that the aesthetic impacts of a project may amount to an interference with the public's enjoyment of public lands or facilities, yet provide little analysis. See In re J. Philip Gerbode, No. 6F0396R-EB-1, Findings of Fact, Conclusions of Law, and Order, at 23 (Vt. Envtl. Bd. Jan. 29, 1992); In re Northshore Dev., Inc., No. 4C0626-5-EB, Findings of Fact, Conclusions of Law, and Order, at 13 (Vt. Envtl. Bd. Dec. 29, 1988); McShinsky, No. 3W0530-EB, at 10. We are not aware, however, of any case in the past twenty years that denied a project under Criterion 9(K) solely because of its impacts on the view from public lands or facilities. Moreover, despite Appellants' assertions, the facts of McShinsky are inapposite to the conditions of the current project, and when combined with the sparse reasoning in the Environmental Board's decision, we find the case does not control our decision here.

The Board in McShinsky did deny an Act 250 permit to a proposed RV campground under Criterion 9(K), at least in part because of the development's interference with the public's enjoyment of public facilities, reasoning that the campground would alter the natural

50

view and appearance of the White River. McShinsky, No. 3W0530-EB, at 10. The Board explained that the White River was a public investment frequently used for a host of recreational opportunities and the view from the river and adjoining land was one of largely undeveloped lands with a few small houses and structures, but no commercial development. Id. The Board concluded that a 20-site RV campground on the bank of the river would spoil the scenic natural view and diminish the enjoyment of those using the river as well as those gazing as they passed by. Id. The Board also found support to deny the campground under Criterion 9(K) because the campground would interfere with the public's access to the river. Id.

Here, the setting is not comparable. Users of the canal path, unlike the recreational users of the White River, do not look out at undeveloped wilderness. Rather, Lot 15 is one lot in a 15-lot commercial subdivision and is surrounded by development. While pedestrians looking north from the path are immediately confronted with the open field of Lot 15, directly beyond Lot 15 are multiple commercial buildings.

Moreover, although an open field may be more aesthetically pleasing than a grocery store, any interference with the public's use and enjoyment of the canal path was entirely foreseeable. The area is not pristine wilderness valued for its undeveloped nature, but, rather, Lot 15 was designated part of the Commerce Park commercial subdivision long before the Town obtained and easement to construct the walkway. The decision to place the canal path next to Lot 15 was done with the full understanding that commercial development would likely occur in the immediate vicinity. Therefore, we do not accept Appellants' claim that the pleasant visual experience users currently enjoy when walking along the canal path may constitute grounds to deny the Project where it meets all other relevant criteria and where development of Lot 15 was contemplated well before the path was designated or constructed.

Further, the Project calls for substantial landscaping and screening along the path, and the building itself is designed by a local architecture firm to achieve compatibility with its surroundings. These measures will mitigate the aesthetic concerns associated with the view and proximity of the storefront. Applicant proposes to spend over $100,000 on landscaping for the Project and over $28,000 specifically for the canal path and pocket park. While the landscaping will not entirely shield the storefront, and the design will not conceal the fact that the building is a large commercial enterprise, such measures certainly soften the appearance of the building for those using the path.

51

In summary, considering the commercial setting of the area, the understanding that commercial development was planned for Lot 15 well before any public investment was made in the path, and the significant landscaping Applicant proposes to soften the view of the store, we answer Appellants' Question 29 by concluding that the Project will not materially interfere with or jeopardize the public's enjoyment of the canal path.

To complete our discussion of Criterion 9(K), we turn to Appellants' Questions 30 and 31. Together these questions ask whether the Project will unnecessarily or unreasonably endanger the public investment in public facilities such as roads, culverts, and other infrastructure, and whether the project will materially jeopardize or interfere with the function, efficiency, or safety, or the publics' use, enjoyment, or access to the public facilities. The only impacts to public investment, aside from the canal path discussed above, that Appellants raise in this matter, are the Project's impacts on the local roads and related infrastructure due to increased traffic and stormwater runoff.

As the stormwater issue was addressed in our discussion of Criterion 1(E), we need not substantially revisit it here. It suffices that the stormwater runoff associated with the Project during major storm events will not cause or significantly contribute to flooding on adjacent properties or at the Patrick Brook Culvert under Route 116, and therefore will not unnecessarily or unreasonably endanger the public or quasi-public investment in the roads and culvert nor will the Project's stormwater materially jeopardize the function, safety, or the public's access to, the public infrastructure. As there was no other evidence of any impacts to public infrastructure from stormwater, we answer Appellants' Questions 30 and 31 by concluding that the Project's stormwater measures adequately manage the Project's stormwater impacts in compliance with Criterion 9(K).

Turning to concerns related to traffic, our review of traffic safety under Criterion 9(K) is similar to that under Criterion 5. See In re Pittsford Enters., No. 1R0877-EB, Findings of Fact, Conclusions of Law, and Order, at 36 (Vt. Envtl. Bd. Dec. 31, 2002) (holding that when considering the impact upon a state or local highway, as a public investment, review can be similar under Criteria 5 and 9(K)). As we have already extensively discussed the Project's traffic impacts under Criterion 5, our discussion here will be brief. There are, however, important differences between the analysis under Criterion 5 and 9(K). Specifically, because a project may be denied under Criterion 9(K), unlike Criterion 5, proscribable impacts must meet the higher

threshold "of material jeopardy or material interference, which is absent from the language of Criterion 5." In re Swain Dev. Corp., Findings of Fact, Conclusions of Law, and Order, at 34 (Vt. Envtl. Bd. Aug. 10, 1990).

Appellants appear to argue that the increased traffic generated by the Project, including truck traffic, will degrade and exceed the capacity of local public infrastructure, and interfere with the public's use and the safety of the roads and sidewalks. Like we concluded under Criterion 5, because of current congestion issues in Hinesburg and the volume of additional traffic that will likely be generated by the Project, mitigation is necessary to prevent unnecessary or unreasonable interference with the public investment in roads and related infrastructure. Yet, with Applicant's mitigation measures and the additional conditions we imposed to offset traffic impacts, the congestion and safety issues will be no worse post-development, and in many instances will improve.[48] The combination of roadway improvements, additional sidewalks, and signalization upgrades that will be achieved by the Project will ensure that the public infrastructure is adequately protected and the function and safety of the facilities will not be materially diminished.

Therefore, we find the Project does not unnecessarily or unreasonably endanger the public investment in local infrastructure, nor will it materially interfere with or materially jeopardize the function, efficiency, or safety of, or the public's use, enjoyment, or access to, the public facilities. As a result, we answer Appellants' Questions 30 and 31 by concluding that the Project satisfies Criterion 9(K).

d.    Criterion 7

Criterion 7 requires an examination of whether a project will "place an unreasonable burden on the ability of the local governments to provide municipal or governmental services." 10 V.S.A. § 6086(a)(7). While the initial burden of production under Criterion 7 is on the applicant, the burden of proving that the project does not conform to Criterion 7 rests with the project opponents. 10 V.S.A. § 6088(b); In re Rivers Dev. Act 250 Appeal, Nos. 7-1-05 and 68-3-07 Vtec, slip op. at 33 (Vt. Envtl. Ct. Mar. 25, 2010) (Durkin, J.).

Although Appellants suggest that the Project will place an unreasonable burden on municipal services, and therefore should be denied (Question 26), Appellants provide little

---

[48] This answers the portion of Appellants' Question 24 relating to Criterion 9(K).

support for their claim. Through our consideration of the evidence, only two issues appear relevant to Criterion 7—wastewater allocation and fire services.

We consider the water capacity and allocation concerns a non-issue. Applicant applied for and received a waste water and water supply allocation from the Town in 2013. Subsequently, the Town informed Applicant that the allocation had been revoked because Town did not have the capacity to meet the allocation and had been directed by the State to place a moratorium on all new hookups. The Town is working to resolve its capacity issues through the installation of new filtration systems and a series of new wells. As soon as these measures are in place and the water supply resolved, Applicant's allocation will automatically be renewed. Without capacity, the Project cannot be completed and thus will not place any burden on the water supply. Once capacity is restored, Applicant will receive and the Town will be able to meet, the necessary allocation. Therefore, we find that the Project will not place an unreasonable burden on the Town's municipal water supply.

The second issue concerns the fact that the Town does not own an aerial ladder truck as part of its fire services vehicle fleet. As a result, the Hinesburg Fire Department does not have the capability to fully serve the proposed building. This deficiency, however, is not caused by the Project. In fact, the Fire Department cannot fully serve several existing buildings, including CVU high school, NRG, and Saputo. In order to address this issue, the Town participates in a mutual aid agreement with the fire departments of surrounding towns, several of which, such as Essex, have an aerial ladder truck. The Town currently plans to purchase a truck with ladder capabilities in the near future. Applicant will pay around $19,000 as a fire impact fee that will aid in the acquisition of a ladder truck. Currently, the Town will be able to meet Applicant's emergency needs through the mutual aid agreement, and when the Town acquires its own ladder truck, Applicant will have contributed its proportional share. We therefore find that the Project will not place an unreasonable burden on the Town's ability to provide fire services.

For the foregoing reasons, we answer Appellants' Question 26 by concluding that the Project complies with Criterion 7.

e.   Criterion 8 (Aesthetics)

Criterion 8 of Act 250 requires an applicant to provide sufficient evidence to enable the Court to find that the proposed project "will not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rate and irreplaceable natural areas." 10

V.S.A. § 6086(a)(8). If an applicant satisfies the initial burden of production, then the ultimate burden of proving that a project does not conform to Criterion 8 rests upon the project's opponents. 10 V.S.A. § 6088(b); In re Rivers Dev. Act 250 Appeal, Nos. 7-1-05 and 68-3-07 Vtec, slip op. at 33 (Vt. Envtl. Ct. Mar. 25, 2010) (Durkin, J.) (citing In re Route 103 Quarry, No. 205-10-05 Vtec, slip op. at 8 (Vt. Envtl. Ct. Nov. 22, 2006) (Durkin, J.), aff'd, 2008 VT 88, 184 Vt. 283). The cornerstone of the Criterion 8 analysis is the question: "[w]ill the proposed project be in harmony with its surroundings—will it 'fit' the context within which it will be located?" In re Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law, and Order, at 18 (Vt. Envtl. Bd. Nov. 4, 1985).

Appellants' Question 27 mirrors the statute, and asks whether the project will have an "undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or irreplaceable natural areas" under Criterion 8. 10 V.S.A. 6086(a)(8). There was no offer or evidence of historic sites or rare or irreplaceable natural areas at the Project site or in the surrounding area. Further, to the extent Appellants made any offer that the area is one of scenic or natural beauty, we find the evidence directs us to conclude otherwise. The Project is proposed in a commercial subdivision for the last undeveloped lot, and the subdivision borders additional commercial uses. We therefore limit our Criterion 8 review to the Project's aesthetic impacts.

When considering the aesthetic impacts of a project, we engage in the two step analyses known as the "Quechee test." In re Goddard Coll., Nos. 175-12-11 and 173-12-12 Vtec, slip op. at 12 (Vt. Super. Ct. Envtl. Div. Jan. 6, 2014) (Walsh, J.); see also In re Rinkers, Inc., 2011 VT 78, ¶ 9, 190 Vt. 567 (approving use of Quechee test). First, we must determine whether the proposed project may cause an adverse impact on the character of the area. Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, at 17. The word "adverse" has been interpreted to mean "unfavorable, opposed, [or] hostile" to the character of the area. Id. (quoting In re Brattleboro Chalet Motor Lodge, Inc., No. 4C0581-EB, Findings of Fact, Conclusions of Law, and Order, at 6 (Vt. Envtl. Bd. Oct. 17, 1984)). In other words, we ask whether the project will "fit" into its surroundings. In re Quechee Lakes, Nos. 3W0411-EB and 3W0439-EB, at 18. This analysis necessarily depends on the character of the area surrounding the proposed project. See id. If no adverse impact is found, our inquiry ends and the project may not be denied due

to aesthetics.  Id.  If we do find an adverse impact, we then ask whether that impact will be "undue."  Id.

Here, the character of the area is one of a mix of commercial uses, without any clear architectural theme or significant aesthetic character.  Lot 15 is one parcel within the 15-lot Commerce Park subdivision, an area zoned for commercial and light industrial uses with commercial enterprises on every lot.  Bordering Lot 15 to the west, outside of the Commerce Park subdivision, is a metal Quonset hut operating as an auto body shop.  Adjacent to this lot are an auto salvage yard and a used car dealership.  Bordering Lot 15 on its northwestern corner is a two-story flat-roofed commercial building owned by Dark Star Lighting.  To the northeast are two of the newer buildings in the subdivision, the post office and National Bank of Middlebury.  On the north side of Commerce Street, across from the entrance drive to the proposed Hannaford, is a self-storage operation consisting of several long rectangular structures divided into individual self-storage units.  Nearby, although not part of the Commerce Park subdivision, is the 76,000-square-foot NRG building.  It is this area that sets the stage for our adverse impacts analysis.

Despite the commercial setting, Applicant employed several measures to minimize aesthetic concerns.  The store was designed by a local architecture firm that incorporated design aspects from the village area.  The building will be a single story with a pitched roof edge, giving the appearance of a pitched roof and concealing the HVAC unit, while leaving a flat space for solar panels.  The total height of the building will reach 27 feet (the maximum allowed is 35 feet).  Although the building at 36,000 square feet is larger than those immediately adjacent to it, many of the lots in the Commerce Park subdivision have little landscaping and are prominently visible from Commerce Street and parts of Route 116.  Further, the store is designed to reduce its apparent size.   Any one side of the building is no longer than several store fronts in the subdivision, and the store will be offset so the full length of any one side will not parallel a roadway.  Undoubtedly large though the store may be, with the existing trees and proposed landscaping, both the store and associated parking lot will be substantially screened from Route 116 and Mechanicsville Road, and it will be setback from Commerce Street with plantings to soften the view.

Considering the surroundings and the design of the Project, it is not apparent that the Project will have an adverse aesthetic impact. Nevertheless, assuming that an adverse impact will result, we consider whether the impact is "undue."

An adverse impact will be considered "undue" if we find any one of the following three conditions: (1) that the project violates a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; (2) that the project offends the sensibilities of the average person; or (3) that the applicant has failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings. In re Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law, and Order, at 19–20 (Vt. Envtl. Bd. Nov. 4, 1985). Here, we conclude that the Project does not violate any of the three conditions, and thus any adverse impact is not, undue.

First, the evidence fails to establish a clear, written community standard intended to preserve the natural beauty of the area. Appellants reference the original Act 250 and subdivision permits, suggesting they contain clear aesthetic standards. At most, however, the permits contain general aspirational language directing that proposals should consider the aesthetics of the development. For example, the 1986 subdivision approval provides that lots on the exterior of the subdivision will "receive particularly close attention for aesthetically pleasing construction." Appellants' Ex. Courtney B at 2. Such language merely mirrors the review already required under Criterion 8, and fails to rise to the level of a clear standard against which the Project can be judged.

Second, Appellants have failed to establish that the Project will offend the sensibilities of the average person. Appellants offer the testimony of Ms. Morgante and Ms. Courtney as evidence that the Project will have an undue adverse impact on the aesthetics of the area. Ms. Morgante was the project coordinator for the Hinesburg Streetscape project and Ms. Courtney was offered as a witness with specialized knowledge and experience with land use and development issues. We are directed, however, to consider the Project's impact from the perspective of the average person. See In re Goddard Coll., Nos. 175-12-11 and 173-12-12 Vtec, slip op. at 14 (Vt. Super. Ct. Envtl. Div. Jan. 6, 2014) (Walsh, J.). Due to their heightened interest and specialized knowledge, we find Ms. Morgante and Ms. Courtney do not have the

perspective of the average person, and thus their testimony fails to provide an accurate assessment of whether the Project will offend the sensibilities of the average person.

Due to the current conditions and proposed plantings, views of the Project will be significantly limited for those approaching Hinesburg along Route 116. Many of the other developments in the subdivision appear prominently for drivers on both Route 116 and Commerce Street. The building height, 27 feet, is 8 feet below the maximum allowed for the area, and is similar in height to the surrounding buildings. Over $100,000 will be spent on landscaping, providing significant screening of the parking lot and building itself. The one-story building has a unique design and incorporates cues from the village area. A covered walkway on three sides of the building and a hipped roof help break up the roof lines and diminish the appearance of a big box store. Considering the Project's surroundings—commercial development with little landscape screening or consistent character—we find the Project will not offend or shock the sensibilities of the average person.

Lastly, we conclude that Applicant has taken reasonable and generally available mitigating steps to improve the harmony of the Project with its surroundings. Applicant has redesigned the building twice in attempts to tailor the Project to fit the lot and the neighborhood. Applicant contracted with a local architecture firm, Bast and Rood, to design a unique exterior so that the building could incorporate design cues from the village and fit its surroundings. In addition, Applicant hosted public forums and sought public comment so that it could understand concerns of the Town and local residents, and then addressed many of those concerns through design changes. While some residents oppose the Project due to its size, claiming that a smaller store would more appropriately fit within the lot, we do not consider the general objection—"the store is too large"—to raise a specific aesthetic concern. What is more, we do not consider the option of reducing the square footage of the Project by thousands of feet, to be the type of mitigation a reasonable person would generally take to improve the harmony of the Project with its surroundings. At some point, classifying fundamental changes to the Project as merely mitigation renders the idea of generally available mitigation, limitless. When we consider specific concerns related to the Project's size, for instance, that the Project "looks like a box store," we find that Applicant has taken reasonably available steps to mitigate these concerns.

In sum, although some of the aesthetic impacts of the Project could be considered adverse, we conclude that none will be "undue." We therefore answer Appellants' Question 29 because we conclude that the Project satisfies Criterion 8.

f.      Criterion 10 (Conformance with Town Plan)

Appellants' Question 31 raises the issue of whether the Project complies Criterion 10, which requires that Applicant show that its proposal is in conformance with any duly adopted local or regional plan or capital program under 24 V.S.A. Chapter 117.  10 V.S.A. § 6086(a)(10). While the burden of proof under Criterion 10 is on Applicant to show conformance, the opponents of the Project must raise specific provisions of the plan in order to challenge Applicant's showing.  See 10 V.S.A. § 6088.

In order to find non-conformity with a provision of a town plan, that provision must be stated in clear language that lays out a specific policy or criteria and does not create ambiguity. In re John A. Russell Corp., 2003 VT 93, ¶ 16, 176 Vt. 520.  If the plan provision merely announces aspirational goals or policy abstractions, it provides no basis to deny a project under Criterion 10.  Id.

Here, Applicant has made a sufficient showing for us to conclude that the Project complies with the Town Plan adopted on June 13, 2005 (Town Plan).  Moreover, neither Appellants nor the Town have identified any mandatory provisions of the Town Plan that appear to conflict with the Project.  Appellants' general assertion that the Project does not comply, without any reference to a specific provision, is insufficient to raise a cognizable challenge.  See Reporters Notes V.R.E.C.P. 5(f) ("The statement functions like a pleading to limit the issues that are to be heard   . . . .").  Without any guidance, we will not scrutinize every aspect of the Town Plan to ensure conformance.  Based on the evidence presented, we therefore find that Applicant has demonstrated compliance with the Town Plan.

**CONCLUSION**

For the reasons provided above, we conclude that the Project, as conditioned, complies with all applicable Act 250 criteria except Criterion 2.  The District Commission denied Applicant's land use permit application under Criterion 2, holding: "The Project does not comply with Criterion 2. Once a new water supply is available, the Applicants can submit that

59

allocation letter to get a determination of positive compliance under Criterion 2."[49] This issue was not appealed by Applicant and our decision here does not alter the conclusion and holding of the District Commission on Criterion 2.

We therefore **AFFIRM** the District Commission's Finding of Fact, Conclusions of Law and Order in Application #4C0654-14 (Altered) as modified by this decision, including the addition of the following conditions:

1) A traffic signal shall be installed at the Mechanicsville Road Route 116 intersection and the signal shall be coordinated with the signals at the Commerce Street/Route 116 and Charlotte Road/Route 116 intersections. Applicant shall pay a proportional share of the cost of installing and coordinating the signal.[50]

2) Post-development, Applicant and the Town shall conduct a traffic study of the Route 116 left-turn lane at the intersection with Commerce Street to confirm that the 185-foot lane length is adequate. If post-development the lane length is inadequate, Applicant shall obtain a further amendment to the Act 250 permit for any necessary mitigation. Costs shall be shared proportionally.

3) Truck traffic shall be limited as laid out in Mr. Dickinson's TIA report and TIA Addendum in the following ways: trucks WB-62 size or larger making deliveries to the site shall be limited in the following ways: trucks traveling south along Route 116 shall not make deliveries to the Hannaford between the a.m. and p.m. peak hours (7:00–9:00 a.m. and 3:30–6:00 p.m.); trucks traveling north along Route 116 shall at all times enter the site via Mechanicsville Road.

A Judgment Order accompanies this Merits Decision. This completes the current proceedings before this Court.

Electronically signed on April 12, 2016 at 10:37 AM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division

---

[49] A copy of the District Commission's decision was provided prior to trial. See Applicant's Mem. in Opp'n to Mot. to Intervene and Req. for Party Status of Denise Guttler, Tab A, filed Sept. 15, 2014.

[50] One potential option is for Applicant to pay for the signal and then seek reimbursement.